1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10 LIA YEAR TRICOMO,

11                              Petitioner,

12        v.

13 JENEVA COTTON,

14                              Respondent.

CASE NO. 3:21-cv-05792-DGE-DWC

REPORT AND RECOMMENDATION

NOTED FOR:  April 29, 2022

15

16        Before the Court is Petitioner's petition for writ of habeas corpus under 28 U.S.C. § 2254

17 ("Petition"). Dkt. 1. The Petition contains three grounds for relief. *Id.* at 5, 7–8. As discussed

18 below, it is **recommended** that an evidentiary hearing be **held** on claim 1. It is further

19 **recommended** that claims 2 and 3 be **denied** and that a certificate of appealability be **denied** on

20 these claims. Finally, if this Report and Recommendation is adopted, the undersigned

21 recommends consideration of appointment of counsel as provided herein.

22

23

24

1

## BACKGROUND

2

### I. State Court

3

The Court takes the following background partly from the opinions of Division Two of

4

the Court of Appeals of Washington ("state court of appeals") affirming Petitioner's conviction

5

on direct appeal and denying her personal restraint petition ("PRP"). *State v. Tricomo*, 193 Wash.

6

App. 1037 (2016) ["*Tricomo I*"]; *Matter of Tricomo*, 13 Wash. App. 2d 223 (2020) ["*Tricomo*

7

*II*"]. Because Petitioner has not challenged these findings, the Court may rely on them to rule on

8

the Petition. *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004) (citations omitted).

9

"In late March 2013, [Petitioner] attempted suicide and was admitted to a hospital. As

10

part of her treatment, her doctor prescribed her Paxil, an antidepressant." *Tricomo*, 13 Wash.

11

App. 2d at 228. "At a follow-up medical appointment on April 3, her Paxil prescription was

12

renewed." *Id.* "She saw her therapist the next day, who encouraged her to stay on her

13

antidepressants." *Id.*

14

"On April 29, [Petitioner] brought some of her belongings to the home of her former

15

counselor, John Alkins, to move in with him." *Id.* "[Petitioner] and Alkins drank vodka

16

together." *Id.* "They had a sexual encounter in his home." *Id.* "During this sexual encounter,

17

[Petitioner] attempted to tie him up with a rope, but he stated he did not like it, so she untied

18

him." *Id.* "After untying Alkins, [Petitioner] grabbed a razor blade knife she had hidden in the

19

bedroom, and she slit his throat approximately six times." *Id.* at 228–29. "Alkins walked around

20

his house for several hours trying to stop the bleeding." *Id.* at 229. "[Petitioner] followed him

21

throughout the house to ensure he would not leave." *Id.* "There was a struggle for the razor blade

22

knife at the front door, and Alkins's wrist was cut during this struggle." *Id.* "Alkins then went

23

back upstairs." *Id.* "[Petitioner] strangled Alkins with an extension cord, killing him." *Id.*

24

1    "The next day, [Petitioner] was arrested, and she confessed to the police." *Id.* "During her

2    interview with the police, [Petitioner] mentioned the negative effect of her medication." *Id.*

3    "Later, when [Petitioner] was in jail prior to trial, a psychiatric note said, 'Paxil, made her want

4    to kill people, had horrible withdrawal,' and the Paxil was discontinued." *Id.*

5    "The State originally charged [Petitioner] with first degree attempted murder and first

6    degree murder, but the State amended the information on November 6, 2014 as part of the plea

7    agreement." *Id.* at 229 n.1. In the amended information, "[t]he State charged [Petitioner] . . . with

8    second degree murder, three counts of second degree assault, and second degree taking a motor

9    vehicle without the owner's permission." *Id.* at 229. "The three counts of second degree assault

10   were based on [Petitioner's] use of a razor blade knife to inflict neck wounds, use of a razor

11   blade knife to inflict facial wounds, and use of a razor blade knife to inflict hand wounds." *Id.*

12   "[Petitioner] pleaded guilty to the amended information." *Id.*

13   "For the second degree murder count, the parties agreed on a standard range sentence of

14   257 to 357 months." *Id.* "The plea agreement stated that while the State was going to recommend

15   357 months on the second degree murder count, the defense [was] free to argue for a lesser

16   sentence . . ." *Id.* (alteration adopted) (internal quotation marks omitted). "The State's sentencing

17   memorandum provided [that], [p]ursuant to plea agreement, [Petitioner could] argue for no less

18   than 257 months prison which [was] the low end of the standard range." *Id.* at 230 (internal

19   quotation marks omitted).

20   "At the plea hearing, the trial court informed [Petitioner] that the applicable maximum

21   term of confinement for the second degree murder charge was a life sentence, the standard range

22   of actual confinement was 257 to 357 months, and the State would recommend a sentence of 357

23   months." *Tricomo I*, 193 Wash. App. 1037, at *1 (internal quotation marks omitted). "[W]hen

24

1   discussing that the State would recommend 357 months, the court addressed [Petitioner] and

2   said, 'And you understand that you are not agreeing that that is what the court should order and

3   that, in fact, defense counsel will be able to argue that the court should impose a lesser sentence

4   on your behalf.'" *Tricomo II*, 13 Wash. App. 2d at 230 (alteration adopted). "[Petitioner]

5   confirmed that she understood the parameters of her plea agreement as explained by the trial

6   court." *Id.*

7        "Before the sentencing hearing, both [Petitioner] and the State filed sentencing briefs."

8   *Id.* "In her brief, [Petitioner] asked the court to consider expert Dhyana Fernandez's mitigation

9   report and the reports of Dr. David Dixon and Dr. Delton Young." *Id.* "All three experts

10  discussed the effects that the use and withdrawal from Paxil may have had on [Petitioner's]

11  ability to form intent at the time of the crime." *Id.*

12       "Dixon, the defense expert, and Young, the State's expert, reached contradictory

13  conclusions regarding Paxil's effects on [Petitioner's] mental state." *Id.* "Prior to pleading guilty,

14  [Petitioner] was evaluated for diminished capacity by Dixon, a psychologist." *Id.* "Dixon

15  discussed Paxil in his report and concluded, 'Use of and withdrawal from Paxil at the time of the

16  alleged crime may have diminished her ability to form intent, a requisite mental state.' Paxil

17  withdrawal exacerbated her mood disorder into a manic state with psychosis." *Id.*

18       "The State's expert, Young, also conducted a forensic psychological evaluation." *Id.* "He

19  disagreed with Dixon about Paxil stating, 'There was no withdrawal: she was taking the

20  medication every day (including on April 29th) as prescribed. It is possible that the medication

21  generated aversive side effects (e.g., feeling "nothing"); but it is more likely that the psychotic

22  symptoms stemmed from alcohol abuse in a psychologically vulnerable individual.'" *Id.* at 230–

23  31 (alteration adopted).

24

1    "Fernandez wrote a mitigation report for sentencing, which included a section on Paxil."

2    *Id.* at 231. "Fernandez cited to several peer reviewed journal articles and articles from web-based

3    sources, but the report contained no analysis." *Id.* "The State objected to Fernandez's report

4    because it did not believe Fernandez was qualified to opine about the effects of Paxil." *Id.*

5    "At sentencing, the court said it would not consider the section on Paxil in Fernandez's

6    report." *Id.* "The court reasoned that it did not 'find that Fernandez has any expertise in that

7    particular area and she basically only sets forth a number of articles suggesting that they may

8    have some relevance.'" *Id.* (alteration adopted). "However, the trial court did consider the expert

9    reports from Young and Dixon, and it noted that 'the doctors reference Paxil, both doctors, and

10   the adverse side effects of this medication.'" *Id.*

11   "The State asked the court to sentence [Petitioner] to 357 months and defense counsel

12   asked the court to sentence [Petitioner] to 257 months." *Id.* "The court imposed the top of the

13   standard range—357 months—for the murder conviction, with the other counts to run

14   concurrently." *Id.*

15   "[Petitioner] appealed her convictions and sentence, arguing that her convictions violated

16   double jeopardy, that her guilty plea was not voluntary, and that the trial court erred in refusing

17   to consider the portion of Fernandez's report regarding Paxil." *Id.* (citation omitted); *see also*

18   *Tricomo I*, 193 Wash. App. 1037, at * 6.

19   "On January 2, 2018, [Petitioner] filed a timely pro se PRP, arguing double jeopardy,

20   ineffective assistance of counsel, and prosecutorial misconduct at the plea stage and trial court

21   error for failure to consider the effects of Paxil on her mental state in rendering its sentencing

22   decision." *Tricomo II*, 13 Wash. App. 2d at 232; Dkt. 15-1 at 238.[1]

23   _____

24   [1] All page citations to docket entries refer to the CM/ECF-generated page stamp number at the top, right-hand corner of the page.

Petitioner subsequently obtained counsel who filed a supplemental PRP and reply on December 31, 2018." *Tricomo II*, 13 Wash. App. 2d at 232; Dkt. 15-2 at 2. "In the supplemental PRP, [Petitioner] raised the new claim that she was deprived of effective assistance of counsel because trial counsel failed to obtain an appropriate expert on the effects of Paxil." *Tricomo II*, 13 Wash. App. 2d at 232. "She argued that due to her counsel's failure to obtain a qualified expert, the trial court never received accurate information about Paxil's effects on her mental state, causing the court to sentence her to the high end of the standard range." *Id.* "The supplemental PRP also contained [Petitioner's] reply in support of her timely raised argument that the trial court erred in declining to consider the effects of Paxil at sentencing." *Id.*

"A commissioner of [the state court of appeals] accepted the supplemental petition for filing and ruled that [the state court of appeals] would decide whether to review the untimely claim when [it] address[ed] the merits of the timely filed pro se PRP." *Id.*

The state court of appeals denied the PRP. *Id.* at 251. It concluded that "[t]he issue raised in [Petitioner's] supplemental petition [was] time-barred." *Id.* It further concluded that "[t]he issues raised in the original petition [were] either denied on their merits or [] denied because they were resolved on direct appeal." *Id.*

After the Petition was filed (Dkt. 1), Respondent filed a Response and the state court record (Dkts. 14–15) and a Reply to the Response was filed. Dkt. 22.

## LEGAL STANDARD UNDER 28 U.S.C. § 2254(d)

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254 . . . ." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). Subject to two exceptions, § 2254(d) bars a state prisoner from obtaining habeas relief on a claim that was adjudicated on the merits in state court. *Id.* at 97–98.

The first exception, § 2254(d)(1), allows habeas relief if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." A state court's adjudication is "contrary to" clearly established Supreme Court precedent if the court either: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme Court; or (2) decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under § 2254's "unreasonable application" clause, courts may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the case. *Id.* at 413.

An unreasonable application of federal law differs from an incorrect application of federal law. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation omitted). For the application to be unreasonable, "a state prisoner must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

The second § 2254 exception, § 2254(d)(2), allows habeas relief if the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Ochoa v. Davis*, 16 F.4th 1314, 1325 (9th Cir. 2021) (citation and internal quotation marks omitted). "Rather, a finding is unreasonable if an appellate court could not reasonably conclude that the finding is supported by the record." *Id.* at 1325–26 (citation and internal quotation marks omitted).

1    "[T]he relevant state court determination for a habeas petition is the last reasoned state

2    court decision." *Dickens v. Ryan*, 740 F.3d 1302, 1309 (9th Cir. 2014) (en banc). In applying §

3    2254(d) to the last reasoned state court decision, the Court's "analysis is limited to the facts in

4    the state court record." *See Jones v. Ryan*, 1 F.4th 1179, 1189 (9th Cir. 2021); *see also*

5    *McDaniels v. Kirkland*, 813 F.3d 770, 780 n.7 (9th Cir. 2015) (en banc).

6                                **DISCUSSION**

7    **I.    Claim 1**

8        A.    <u>Introduction</u>

9        Petitioner alleges that trial counsel provided ineffective assistance. Dkt. 1 at 5. In support,

10   she contends:

11       My lawyer did not hire the proper expert to evaluate the effect of . . . Paxil[] on my
         behavior. He hired a psychologist who did not correctly understand the effect of
12       Paxil. Had he retrained a . . . psychiatrist, counsel could have properly presented
         the mitigating effects of this drug to the judge who sentenced me. If the judge had
13       been informed by a qualified expert of the mitigating effects of Paxil, he would
         have given me a lesser sentence . . . .

14   *Id.*

15       "On January 2, 2018, [Petitioner] filed [her] timely pro se PRP . . . ." *Tricomo II*, 13

16   Wash. App. 2d at 232; Dkt. 15-1 at 238. Petitioner then filed her supplemental PRP in which she

17   raised the claim she is raising in this case as claim 1. Dkt. 15-2 at 2–42. The state court of

18   appeals denied this claim as untimely under Washington law. *Tricomo*, 13 Wash. App. 2d at

19   770–75; Dkt. 15-1 at 38–49.

20       Based on the state court of appeals' procedural ruling, Respondent argues that this claim

21   is procedurally defaulted and that Petitioner has not shown cause or prejudice for the default.

22   Dkt. 14 at 24–27. Petitioner does not dispute these arguments but contends that she satisfies the

23

24

REPORT AND RECOMMENDATION - 8

1    "exception for procedural default" enunciated in *Martinez v. Ryan*, 566 U.S. 1 (2012). Dkt. 22 at

2    16–22.

3        *Martinez* held: "Where, under state law, claims of ineffective assistance of trial counsel

4    must be raised in an initial-review collateral proceeding, a procedural default will not bar a

5    federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the

6    initial-review collateral proceeding, there was no counsel or counsel in that proceeding was

7    ineffective." 566 U.S. at 17. "To overcome the default, a prisoner must [] demonstrate that the

8    underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that

9    the prisoner must demonstrate that the claim has some merit." *Id.* at 14. "The analysis of a

10   claim's substantiality mirrors the standard for issuing a certificate of appealability, . . .—namely,

11   whether 'reasonable jurists would find' the denial of relief 'debatable or wrong.'" *McGill v.*

12   *Shinn*, 16 F.4th 666, 698–99 (9th Cir. 2021) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 338

13   (2003)).

14       Here, no counsel represented Petitioner when she filed her initial PRP. *See Tricomo II*, 13

15   Wash. App. 2d at 232. Furthermore, Respondent has not disputed that she has "satisfied the first

16   part of the *Martinez* standard." *See* Dkt. 14 at 27–28. Therefore, under *Martinez*, Petitioner has

17   shown that "there was no counsel" "in the initial-review collateral proceeding." *See* 566 U.S. at

18   17. Thus, the issue is whether reasonable jurists would find Petitioner's ineffectiveness claim

19   debatable. *See McGill*, 16 F.4th at 698–99. If so, *Martinez* applies and the Court must review

20   Petitioner's ineffectiveness claim "de novo." *See Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th

21   Cir. 2017) (citations omitted). To be clear, when *de novo* review applies, courts do not apply §

22

23

24

1    2254(d)'s "deferential" standard.[2] *See Kernan v. Hinojosa*, 578 U.S. 412, 413 (2016) (per

2    curiam); *accord Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005) (citations omitted).

3        B.    Facts Relevant to Claim 1

4        On January 14, 2013, Petitioner's therapist at Behavioral Health Resources ("BHR"), Lyn

5    Hertz, completed a treatment note. Dkt. 15-2 at 158. The note states that Petitioner wanted

6    "anger management" and knew that she had a problem with it. *Id.* The record reflects that

7    Petitioner had a history of violent conduct, including a conviction for third-degree assault on a

8    police officer and a charge of domestic violence against her sister. *See, e.g., id.* at 136; Dkt. 15-3

9    at 665.

10       Ms. Hertz continued to provide therapy for Petitioner in January 2013. Dkt. 15-2 at 159–

11   61. In her February 14, 2013 treatment note, Ms. Hertz stated that Petitioner "[p]rocessed two

12   different experiences—sudden anger that she feels she has no control over and her enjoyment of

13   inflicting pain on others." *Id.* at 162. Ms. Hertz provided therapy for Petitioner in February and

14   early March 2013. *Id.* at 163–68. According to Ms. Hertz's treatment note, during the February

15   28, 2013 session, Petitioner stated that her "bad mood" was "related to lack of sexual release."

16   *Id.* at 167. The note also states that Petitioner was "having 'fun' fighting with her sister." *Id.*

17       On March 25, 2013, Petitioner went to the hospital and complained of depression and

18   suicidal thoughts in the hope of receiving medication. *Id.* at 131, 135. According to the

19   provider's note, Petitioner stated that she had "been struggling lately with a guy who reported

20   that she had assaulted him by going too far when they were doing sex play." *Id.* at 135. The

21   provider further reports that Petitioner stated she had taken Paxil before and it "worked well, but

22   [] when she got 30 mg she became giddy and childlike." *Id.* A physician at the hospital instructed

23   ─────────────────────

24   [2] As discussed, § 2254(d) prescribes a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citation and internal quotation marks omitted); *supra* pp. 7–8.

1    Petitioner to take 20 mg of Paxil every morning for 15 days and to stop taking it if she felt giddy.

2    *Id.* at 132.

3        On April 3, 2013, a doctor at a community health center renewed Petitioner's prescription

4    for Paxil. *Id.* at 133–35. The following day, Ms. Hertz stated in a treatment note that she

5    validated Petitioner's assertion that she did not have anger issues recently. *Id.* at 169. Ms. Hertz

6    further stated that they discussed the addition of antidepressants to Petitioner's therapy and how

7    well she was doing on them. *Id.*

8        On April 25, 2013, Ms. Hertz provided therapy for Petitioner. *Id.* at 171. In her treatment

9    note, Ms. Hertz stated that Petitioner did not like how Paxil made her feel "calmer and happier"

10   because it was "uncomfortable and unfamiliar" and seemed to "take away her energy for acting

11   out in anger." *Id.* Ms. Hertz also stated that Petitioner identified being alive as the "root cause of

12   her anger." *Id.*

13       Petitioner killed Mr. Alkins on April 29, 2013. *See Tricomo*, 13 Wash. App. 2d at 228–

14   29. The following day, police officers interrogated her. Dkt. 15-3 at 175–99. Petitioner stated

15   that she had drunk a "crazy amount" of vodka before she killed Mr. Alkins. Dkt. 15-2 at 182–84.

16   Further, Petitioner stated that her medication "wasn't really working" and made her feel "numb"

17   and incapable of feeling. *Id.* at 180, 195–96, 198.

18       On September 9, 2013, a prison psychiatrist evaluated Petitioner. *Id.* at 201–02.

19   According to the history-of-present-illness section of the psychiatrist's report, Paxil made

20   Petitioner "want to kill people." *Id.* at 201. Further, the report states that Petitioner had not taken

21   Paxil for four months. *Id.* The psychiatrist discontinued Paxil and prescribed new medication. *Id.*

22   at 202.

23

24

1    At a July 18, 2013 hearing, based in part on a recommendation from Western State

2  Hospital ("WSH"), the trial court found Petitioner competent to stand trial. Dkt. 15-3 at 569,

3  573–74. Robert Jimerson represented Petitioner at this hearing. *Id.* at 570.

4    Sometime after the July 18, 2013 hearing and before February 22, 2014, Patrick

5  O'Connor started representing Petitioner. *See id.* at 741. Mr. O'Connor referred Petitioner to Dr.

6  Dixon, a clinical psychologist, for a forensic psychological examination and evaluation for

7  "diminished capacity at the time of the . . . crime." *Id.*

8    After interviewing Petitioner on four occasions, Dr. Dixon submitted his report on April

9  30, 2014. *Id.* at 741, 761. Dr. Dixon found that, at the time of the crime, Petitioner "suffered the

10 following mental states contributing to her diminished capacity[]": (1) voluntary intoxication that

11 "may have diminished her ability to form intent"; (2) "Use of and withdrawal from Paxil may

12 have diminished her ability to form intent . . . . Paxil withdrawal exacerbated her mood disorder

13 into a manic state with psychosis"; (3) "PTSD from extension childhood trauma"; and (4)

14 Borderline Personality Disorder. *Id.* at 759. Dr. Dixon further found that Paxil and vodka,

15 "PTSD-like symptoms," and Borderline Personality Disorder contributed to a "[d]ecreased

16 ability to inhibit impulses." *See id.* Additionally, Dr. Dixon diagnosed Petitioner with, *inter alia*,

17 Bipolar Disorder II ("BPD"). *Id.* at 758.

18    Dr. Young, the state's psychologist, reached a different conclusion. Dr. Young noted that

19 Petitioner believed Paxil could have contributed to her attack on Mr. Alkins. *Id.* at 775. Further,

20 Dr. Young noted Dr. Dixon's conclusion that "Paxil . . . contributed to her actions on that day."

21 *Id.* However, according to Dr. Young, "there was no withdrawal: she was taking the medication

22 every day (including on April 29th) as prescribed." *Id.* Dr. Young added: "It is possible that the

23 medication generated aversive side effects (e.g., feeling 'nothing'); but it is more likely that the

24

1    psychotic symptoms stemmed from alcohol abuse in a psychologically vulnerable individual."

2    *Id.* Also, Dr. Young disputed Dr. Dixon's finding that Petitioner had PTSD and BPD. *Id.*

3        Petitioner pleaded guilty on November 6, 2014. Dkt. 15-3 at 601; Dkt. 15-1 at 13–21.

4    The parties "agreed that they would each recommend a sentence within the standard range" of

5    257 to 357 months. *See* Dkt. 15-3 at 659; Dkt. 15-1 at 14, 16.

6        On January 21, 2015, Mr. O'Connor submitted a sentencing brief and argued for a 257-

7    month sentence. Dkt. 15-3 at 723–27. In support, in addition to Dr. Dixon's report, trial counsel

8    submitted the mitigation report of Ms. Fernandez. *Id.* at 726, 734–39. Ms. Fernandez declared

9    that she had "18 years [of] experience as a mitigation specialist in death penalty cases." *Id.* at

10   731. As relevant here, in preparation of her report, Ms. Fernandez "conducted online research

11   about the negative side effects of . . . Paxil." *Id.* at 731–32. The report provides hyperlinks to

12   those articles, some of which were published in peer-reviewed journals. *Id.* at 737–38. The report

13   also references a book discussing the dangers of antidepressants such as Paxil. *Id.* at 738.

14   Additionally, the report relays Petitioner's statements that Paxil caused her to have violent

15   thoughts. *Id.* at 737.

16       On January 23, 2015, the prosecution submitted its sentencing memorandum. *Id.* at 803,

17   816. The prosecution contended that Washington law did not allow the presentation of mitigation

18   information from "anyone other than [the defendant] or their counsel." *Id.* at 814. Furthermore,

19   as relevant here, the prosecution contended that Ms. Fernandez's opinion on the effects of Paxil

20   was inadmissible because there was no evidence that she was an expert on that subject. *Id.* at

21   814–15.

22       The trial court held a sentencing hearing on January 28, 2015. *Id.* at 647. The trial court

23   ruled that it would accept evidence in mitigation of Petitioner's sentence, but only within the

24

1  agreed-upon sentencing range of 257 to 357 months. *See id.* at 657–59. However, the trial court

2  refused to consider the section in Ms. Fernandez's report about Paxil. *Id.* at 658. It reasoned: "I

3  don't find that she has any expertise in that particular area and she basically only sets forth a

4  number of articles suggesting that they may have some relevance, but I'm not considering her

5  report in that regard . . . ." *Id.*

6         Before announcing the sentence, the trial court stated that "the doctors reference Paxil . . .

7  and the adverse side effects of this medication." *Id.* at 696. Further, the Court appeared to credit

8  Dr. Young's finding that Petitioner "was suffering psychotic symptoms" "[o]n or around the day

9  of the [crimes]." *See id.* at 697. However, the court further stated that, while Petitioner had

10  "mental issues," "[s]ome of those . . . [were] self-created" by the voluntary consumption of

11  "astounding" "amounts" of alcohol. *See id.* at 712. The Court added: "There are issues about

12  taking anti-depressant drugs, Paxil, and that this may somehow have affected your view of life."

13  *Id.* Ultimately, the court sentenced Petitioner to 357 months' imprisonment. *Id.* at 714.

14         In support of her supplemental PRP, Petitioner submitted the psychiatric report of

15  Manuel Saint Martin, M.D. Dkt. 15-2 at 57. Dr. Saint Martin declares:

16      The chronology of [Petitioner's] psychiatric treatment with paroxetine (Paxil) in
the month preceding the offense indicates that she had an adverse medication
17      reaction, namely aggressive and violent behavior. . . . [T]he conclusion is that
paroxetine was responsible for [Petitioner's] aggressive and violent behavior
18      resulting in Mr. Alkin[s's] death.

19      The issue of paroxetine's effect on [Petitioner's] neurobiological state was not
addressed during her criminal proceeding because she was only examined by
20      psychologists. Dr. Dixon and Dr. Young discussed the role of paroxetine in
[Petitioner's] offense and arrived at opposing conclusions. I reviewed Dr. Dixon's
21      and Dr. Young's resumes and neither have experience in the behavioral effects of
psychiatric medications (also known as psychopharmacology). . . . [Petitioner]
22      required a psychiatric evaluation to address the issue of paroxetine's effect on her
mental state during the commission of the crime, but she never had one during the
23      criminal proceedings.

24

. . . . Postmarketing [sic] studies have revealed that paroxetine produces adverse effects of agitation, anger and acting on dangerous violent impulses. These adverse effects include suicidal and homicidal behavior. The adverse effects are more common in adolescents and young adults and in patients who have a history of bipolar disorder. Paroxetine's adverse effects are documented in the Federal Drug Administration (FDA) medication guide published in June 2012.

[Petitioner] is in the latter two categories of persons whom paroxetine can cause serious adverse effects of violence and suicide. She has a diagnosis of bipolar disorder and a history of severe suicidal thoughts and urges to harm people. . . .

In [Petitioner's] case, it is medically probable that using paroxetine accentuated her impulsive and violent behavior. There is a stronger causal link in the records between her psychiatric condition and paroxetine use than there is for alcohol and marijuana causing her violent behavior. . . . [Petitioner] had been taking paroxetine for sufficient time for both its beneficial and adverse effects to emerge.

On April 30, 2013, [Petitioner] called BHR's crisis line to report that she felt aggressive and suicidal and that she had urges to harm someone. She had already committed the offense. . . . When [Petitioner] was interviewed by the homicide detectives, she mentioned twice that she was reacting to paroxetine and that she wanted to discontinue the medication. While the former may be viewed as self-serving and excusing her conduct, the latter statement of feeling numb is a symptom that is reported in individuals who engage in impulsive behavior induced by antidepressant medication. It is improbable that [Petitioner] would have known this fact at the time she was interviewed. . . .

At the time she committed the offense, [Petitioner] was not withdrawing from paroxetine. This medication has a duration of 21 hours in the body and she had taken it on the morning of the offense. Furthermore, the adverse effects of paroxetine occur when the individual is on the medication—not when they are withdrawing from it. Ms. Tricomo had been on the medication continuously for at least one month. . . .

[Petitioner's] treatment subsequent to her incarceration at the jail and the DOC indicated that the doctors concluded that paroxetine was linked to her violent impulses and they refrained from prescribing it. In 2018, [Petitioner] expressed a desire to resume taking paroxetine, but the treatment team at the DOC thought that she did not have sufficient appreciation of the risks of adverse effects. Thus, the doctors treating [Petitioner] immediately after the offense and to the present also believe that paroxetine causes her impulsive violent behavior.

*Id.* at 58–60; *see also id.* at 371–72 (Dr. Saint Martin's supplemental report).

1    Following her conviction and sentencing, petitioner received psychiatric treatment while

2    in prison. *See* Dkt. 22 at 10–11. On April 19, 2018, Kathryn Hall, M.D., entered a psychiatric

3    progress note. Dkt. 15-2 at 205. The note states that Dr. Hall and Petitioner "discussed at length

4    her history of being on paroxetine, which she recalls very positively in terms of decreased

5    depression, but admits it does give her feelings of wanting to kill people." *Id.* The note further

6    states:

7        Well before her crime when she was suicidal and depressed and sent by BHR to
         WSH, they put her on a combination of paroxetine and VPA [Valproic acid]. When
8        on that combination she didn't have thoughts of wanting to kill others, but when
         she got out she stopped the VPA . . . . Without the VPA she had cravings to drink
9        on paroxetine alone, and did drink heavily. So it is hard to know if without alcohol
         the paroxetine would have the same effect.

10   *Id.*

11    Dr. Hall entered another progress note on June 18, 2018. *Id.* at 208. Dr. Hall states that

12   Petitioner "asked to resume paroxetine, despite acknowledging that it made her want to kill

13   people." *Id.* Dr. Hall further states that "[we] shared our concerns that . . . paroxetine had

14   possibly triggered an irritable manic state, leading to her crime." *Id.* Dr. Hall added that

15   Petitioner "did not appear to appreciate" the "risks" of paroxetine. *Id.* Dr. Hall did not prescribe

16   paroxetine. *See id.* at 206, 209.

17        C.    Discussion

18    To establish that counsel provided ineffective assistance, Petitioner must show that

19   counsel's performance was deficient and that the deficient performance prejudiced her defense.

20   *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficiency, Petitioner must show

21   that counsel's performance "fell below an objective standard of reasonableness" as measured by

22   prevailing professional norms. *Id.* at 688. Courts must "indulge a strong presumption that

23   counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

24

1    To prove prejudice, Petitioner must show "a reasonable probability that, but for counsel's

2    unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

3    *Strickland* applies to noncapital sentencing proceedings. *See Daire v. Lattimore*, 812 F.3d 766,

4    767 (9th Cir. 2016) (en banc).

5        Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a

6    reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. Although

7    "strategic choices made after thorough investigation of law and facts relevant to plausible

8    options are virtually unchallengeable[,] and strategic choices made after less than complete

9    investigation are reasonable precisely to the extent that reasonable professional judgments

10    support the limitations on investigation." *Id.* at 690–91.

11        "Criminal cases will arise where the only reasonable and available defense strategy

12    requires consultation with experts or introduction of expert evidence." *Hinton v. Alabama*, 571

13    U.S. 263, 273 (2014) (citation omitted). Likewise, "[c]ounsel have an obligation to conduct an

14    investigation which will allow a determination of what sort of experts to consult." *Caro v.*

15    *Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999). If a defendant has been exposed to chemicals

16    causing "neurological damage" producing "aggressive behavior," this duty may require counsel

17    to present an expert qualified to render such an opinion in mitigation of the defendant's sentence.

18    *See id.* at 1126–28.

19        Here, reasonable jurists could debate whether trial counsel's alleged failure to hire a

20    psychiatrist to evaluate whether Paxil caused Petitioner to act violently was deficient. In the

21    report supporting Petitioner's PRP, Dr. Saint Martin declares that Paxil was "responsible for

22    [Petitioner's] aggressive and violent behavior resulting in Mr. Alkin[s's] death." Dkt. 15-2 at 58.

23    Furthermore, Dr. Saint Martin declares that "[t]here is a stronger causal link in the records

24

between [Petitioner's] psychiatric condition and paroxetine use than there is for alcohol and

marijuana causing her violent behavior." *Id.* at 59. Additionally, Dr. Saint Martin declares that

Drs. Dixon and Young did not have "experience in the behavioral effects of psychiatric

medications" and were not "the appropriate experts[s] to diagnose [Petitioner's] condition . . .

[or] render opinions regarding the patient's behavior and how it can be altered by medication."

*Id.* at 58, 372. Thus, Dr. Saint Martin declares that Dr. Dixon (the defense's expert) and Dr.

Young (the State's expert) were not qualified to discuss, and did not discuss, "[t]he issue of

paroxetine's effect on [Petitioner's] neurobiological state." *See id.* at 58. Although Respondent

disputes that trial counsel deficiently failed to hire a psychiatrist, Respondent has not disputed

that Dr. Saint Martin is qualified to discuss Paxil's psychopharmacological effects.

       Dr. Saint Martin's declaration supports a reasonable inference that Petitioner had a Paxil-

induced neurobiological condition that contributed to her killing of Mr. Alkin's. Thus, trial

counsel arguably had a duty to hire a qualified expert to provide such an opinion in mitigation of

Petitioner's sentence. *See Caro*, 165 F.3d at 1226–28. Trial counsel did submit an expert opinion

from Dr. Dixon. Yet Dr. Saint Martin declares that Dr. Dixon was not qualified to render an

opinion on Petitioner's neurobiological state and did not render such an opinion. Therefore, the

evidence supports a reasonable inference that trial counsel failed to present the trial court with

the type of expert opinion necessary for it to assess Paxil's alleged role on Petitioner's conduct.

       Respondent contends that Dr. Dixon "was qualified to render an opinion in [Petitioner's]

case." Dkt. 14 at 31 (citing Dkt. 15-2 at 298–99). In support, Respondent notes that Dr. Dixon

"has a Ph.D. in clinical psychology" and "a certificate of proficiency in treatment of . . .

psychoactive substance use disorders" and has taught "psycho-pharmacology at Seattle Pacific

University." Dkt. 15-2 at 298–99. However, Dr. Saint Martin declares that these credentials did

1   not qualify Dr. Dixon to discuss "brain physiology and psychoactive medications." *Id.* at 372.

2   Dr. Saint Martin reasons that "[p]sychiatry and psychology are not interchangeable disciplines"

3   and that psychologists have "no training in . . . the biochemical interactions of medications and

4   the various body systems." *Id.* Further, Dr. Saint Martin reasons that Seattle Pacific University is

5   not a medical institution and that, in any event, a "psychologist's role is limited to explaining []

6   behavior" when he teaches "a psychopharmacology course in a medical institution." *Id.* Dr. Saint

7   Martin adds that "[t]he fact that Dr. Dixon stated in his report that he could not separate the

8   effects of alcohol from paroxetine . . . is further evidence of his lack of expertise in

9   neurophysiology because any psychiatrist could have done so." *Id.* Thus, it is debatable whether

10  Dr. Dixon—or Dr. Young—was qualified to discuss whether Paxil caused Petitioner to act

11  violently.

12          Moreover, Ms. Fernandez's report (which Petitioner submitted to the state court) cited

13  sources purporting to establish a scientific link between Paxil use and violence. *See* Dkt. 15-3 at

14  738. So the evidence supports a reasonable inference that trial counsel was "aware" of Paxil's

15  alleged neurobiological effects on Petitioner and yet "failed to consult . . . [an appropriate]

16  expert[ in this field]." *See Caro*, 165 F.3d at 1226; Dkt. 15-3 at 658; *see also* Dkt. 15-2 at 236

17  (trial counsel's admitting that he "relied on [only] Dr. Dixon's report and Ms. Fernandez's

18  mitigation report in support of the defense recommendation for sentencing"). Nor is it evident

19  why, when the trial court refused to consider the section in Ms. Fernandez's report about Paxil,

20  trial counsel did not "ask[] for a continuance to obtain a proper expert to educate the judge about

21  Paxil's [alleged] effect of causing people to act violently." Dkt. 15-2 at 36. True, trial counsel

22  submitted Dr. Dixon's report. However, while Dr. Dixon stated that Paxil diminished Petitioner's

23  ability to form intent and inhibit impulses, he did not clearly state that Paxil caused her to behave

24

1     violently, much less from a psychopharmacological standpoint. *See* Dkt. 15-3 at 759. And, to

2     reiterate, Dr. Saint Martin declares that Dr. Dixon was not qualified to make such a

3     determination. Dr. Dixon's statement that Petitioner was experiencing "withdrawal" of Paxil

4     when she committed the offense may support an inference that he misunderstood Paxil's effect

5     on her behavior; Dr. Saint Martin and Dr. Young both state that she was not experiencing

6     withdrawal at that time. Dkt. 15-2 at 59; Dkt. 15-3 at 775. In short, it is arguable that trial

7     counsel knew of the need to present expert testimony on Paxil's alleged potential to cause

8     violence but failed to make reasonable efforts to obtain that expert testimony.

9            Reasonable jurors could also debate whether trial counsel's failure to hire a psychiatrist

10    to evaluate whether Paxil caused Petitioner to act violently prejudiced her. In sentencing

11    Petitioner, the trial court stated that some of Petitioner's mental issues were "self-created" by

12    voluntary intoxication. Dkt. 15-3 at 712. The court further stated that there were "issues about

13    taking . . . Paxil[] . . . and that this may somehow affected [her] view of life." Dkt. 15-3 at 712.

14    However, Dr. Saint Martin declares that Paxil was "responsible for [Petitioner's] aggressive and

15    violent behavior resulting in Mr. Alkin[s's] death." Dkt. 15-2 at 58. Furthermore, Dr. Saint

16    Martin declares that "[t]here is a stronger causal link in the records between [Petitioner's]

17    psychiatric condition and paroxetine use than there is for alcohol . . . causing her violent

18    behavior." Dkt. 15-2 at 58. Had trial counsel presented Dr. Saint Martin's testimony, the trial

19    court arguably could have not given as much weight to Petitioner's alcohol abuse and been more

20    likely to conclude that Paxil induced her to act violently instead of merely affecting her view of

21    life.

22           Granted, had the trial court so concluded, there is no guarantee that it would have

23    imposed a lower sentence. *See Ramirez v. Ryan*, 937 F.3d 1230, 1245 (9th Cir. 2019) ("To assess

24

th[e] probability [of a more favorable sentence, courts] consider the totality of the available mitigation evidence . . . and reweigh it against the evidence in aggravation." (citation omitted)). The trial court considered "a lot of" sentencing information and "factors." *See* Dkt. 15-3 at 710, 713; *see also* Dkt. 14 at 31 ("Although [Petitioner] faults counsel for not using a psychiatrist in support of mitigation at sentencing, counsel did present extensive psychological evidence to argue that the [trial] court should impose a reduced sentence." (citations omitted)). Furthermore, the trial court regarded Mr. Alkins's murder as a "terribly gruesome situation" that "involve[]d actions over a period of hours" and "numerous assaultive acts." Dkt. 15-3 at 712.

Still, the sentencing transcript suggests that the trial court was open to sentencing Petitioner to anywhere between 257 to 357 months, subject to its evaluation of the Parties' mitigation evidence and other sentencing factors. *Cf.*, *e.g.*, Dkt. 15-3 at 658–60, 711. Furthermore, as noted, the trial court stated that there were "issues about taking . . . Paxil[] . . . and that this may somehow affected your view of life." *Id.* at 712. Therefore, the trial court arguably indicated a willingness to consider Paxil's effects on Petitioner's behavior in mitigation of her sentence. But Dr. Saint Martin's report supports a reasonable inference that trial counsel failed to present proper psychiatric evidence that Paxil use, not alcohol abuse, caused Petitioner to act violently. On this record, it is debatable that a psychiatrist's opinion that Paxil use, not alcohol abuse, caused Petitioner to act violently would have caused the trial court to assess her mitigation evidence more favorably and impose a lower sentence in the 257-to-357-month range. In addition to potentially changing the trial court's understanding of Paxil's alleged role on Petitioner's behavior, such evidence arguably could have led the trial court to weigh the gruesomeness of the offense less heavily against Petitioner.[3]

---

[3] More evidence may weaken the contention that Paxil caused Petitioner to kill Mr. Alkins. There is evidence suggesting that Petitioner had taken Paxil at some point prior to the month before she killed Mr. Alkins

1    Respondent's primary argument is that the "Ninth Circuit rejected an almost identical

2    claim in" *Brown v. Uttecht*, 530 F.3d 1031 (9th Cir. 2008). Dkt. 14 at 29. However, Respondent

3    does not address *Caro*, which reasonably supports Petitioner's ineffectiveness claim.

4    Furthermore, while *Brown* presents some parallels with this case, it is distinguishable in several

5    respects. In *Brown*, in relevant part, trial counsel's mitigation case was based on the theory that

6    the defendant would not have committed the crime had he been "properly treated [with lithium]

7    upon his release from prison." *Id.* at 1033. Here, by contrast, Petitioner contends that the Paxil

8    she was taking when she committed the crime caused her to do so. Furthermore, in *Brown*, the

9    psychologist who provided mitigation testimony "was qualified to testify about lithium." *Id.* at

10   1034. But, here, the Parties dispute whether Drs. Dixon and Young were qualified to offer an

11   opinion about Paxil's alleged link to violence. Additionally, in *Brown*, "retaining a psychiatrist

12   involved significant risk" because, had defense counsel done so, counsel "would have risked

13   obtaining unfavorable written reports[] which they would [] have had to turn over to the

14   prosecution." *Id.* at 1035. In this case, Respondent has not identified any evidence suggesting

15   that presenting Dr. Saint Martin's proffered testimony would have run such a risk. Moreover, in

16   *Brown*, defense counsel initially contacted a psychiatrist and, when he "proved unavailable,"

17   defense counsel decided to "seek[] a continuance" for "legitimate [tactical] reasons." *See id.* at

18   1034–35. Defense counsel "wanted the jury to deliberate over the Christmas holiday, when

19   jurors might be more merciful, and [] wanted to give the prosecution less time to prepare its

20   penalty phase case." *Id.* at 1034. Here, however, trial counsel admits that he did not consult with

21

22   without experiencing a violent reaction. *See* Dkt. 15-2 at 132, 205. Furthermore, there is evidence that Petitioner had
     a history of violence in general. *See, e.g., id.* at 135–36; Dkt. 15-3 at 665. However, in announcing Petitioner's

23   sentence, the trial court focused on the gruesomeness of the murder and seemed to discount Paxil's alleged role. *See*
     Dkt. 15-3 at 712–13. Yet, as discussed, it is reasonable to infer that the trial court would have assessed these factors

24   differently had trial counsel presented Dr. Saint Martin's report. So reasonable jurists would nonetheless debate
     whether Petitioner has shown prejudice.

1   a psychiatrist. *See* Dkt. 15-2 at 236. Nor are any such tactical reasons for not presenting a

2   psychiatrist apparent from the record. In short, reasonable jurists would debate *Brown*'s

3   applicability.

4       D.    Remedy

5       In sum, reasonable jurists would debate whether trial counsel ineffectively failed to hire a

6   psychiatrist to evaluate whether Paxil caused Petitioner to act violently and present evidence of

7   the same in mitigation of Petitioner's sentence. These are the prerequisites for allowing a federal

8   court to hear an otherwise procedurally defaulted claim that trial counsel rendered ineffective

9   assistance. *Martinez*, 566 U.S. at 17.

10      Because the Court must review Petitioner's ineffectiveness claim *de novo*, "an

11  evidentiary hearing on [the] [P]etition is required [if] [P]etitioner's allegations, if true, would

12  entitle [her] to relief, and [] [P]etitioner has satisfied the requirements of *Townsend v. Sain*, 372

13  U.S. 293 (1963)." *See Hurles v. Ryan*, 752 F.3d 768, 791 (9th Cir. 2014) (citation omitted).

14  *Townsend* requires an evidentiary hearing if: "(1) the merits of the factual dispute were not

15  resolved in the state hearing; (2) the state factual determination is not fairly supported by the

16  record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to

17  afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence;

18  (5) the material facts were not adequately developed at the state-court hearing; *or* (6) for any

19  reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact

20  hearing." 372 U.S. at 313 (emphasis added), *overruled on other grounds*, *Keeney v. Tamayo-

21  Reyes*, 504 U.S. 1 (1992).

22      Furthermore, under 28 U.S.C. § 2254(e)(2), Petitioner must show that she has "exercised

23  diligence in pursing [her ineffectiveness] claim[] in state court." *See Jones v. Ryan*, 1 F.4th 1179,

1195 (9th Cir. 2021) (citation omitted). "Diligence for purposes of the opening clause depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court[.] . . ." *Williams v. Taylor*, 529 U.S. 420, 435 (2000).

Here, an evidentiary hearing on Petitioner's ineffectiveness claim is warranted. As the above analysis indicates, if Dr. Saint Martin's allegations are true, Petitioner may be entitled to relief on her ineffectiveness claim. In some cases, counsel's failure to present qualified expert testimony in mitigation of a defendant's sentence may be ineffective. *See Caro*, 165 F.3d at 1226–28.

This case also satisfies *Townsend*'s disjunctive test. The state court of appeals did not resolve the merits of Petitioner's ineffectiveness claim or develop the facts material to this claim. Additionally, Petitioner diligently pursued her ineffectiveness claim in state court. Petitioner timely filed a PRP alleging that the trial court did not properly consider Paxil's alleged role in her actions. Dkt. 15-1 at 246–47. Then, after retaining Mr. Fox, Petitioner filed the supplemental PRP that cited Dr. Saint Martin's report. *Tricomo II*, 13 Wash. App. 2d at 232; Dkt. 15-2 at 2, 57–58. In her supplemental PRP, in part, Petitioner asked the state court of appeals to remand the case "for reasonable discovery and a reference hearing if required." Dkt. 15-2 at 42. Therefore, Petitioner has shown diligence under § 2254(e)(2). *See Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) ("A petitioner who has previously sought and been denied an evidentiary hearing has not failed to develop the factual basis of his claim and therefore satisfies § 2254(e)(2)." (citation omitted)); *cf. Ryan*, 1 F.4th at 1195 (petitioner diligent where postconviction "counsel requested funding for a neuropsychologist and a thorough and independent neurological assessment to assist in the development of [c]laims" (internal quotation marks omitted)).

Accordingly, the undersigned recommends that the District Court hold an evidentiary hearing on Petitioner's ineffectiveness claim. It is appropriate for the undersigned to issue a Report and Recommendation on whether to hold an evidentiary hearing. *See* 1976 Advisory Committee Note to Rule 8, Rules Governing Section 2254 Cases ("Subdivision (b) [of Rule 8] provides that a magistrate [judge], when so empowered by rule of the district court, may recommend to the district judge that an evidentiary hearing be held or that the petition be dismissed, provided [the magistrate judge] gives the district judge a sufficiently detailed description of the facts so that the judge may decide whether or not to hold an evidentiary hearing."); *see also Orand v. United States*, 602 F.2d 207, 208 (9th Cir. 1979) (explaining that Congress has "clearly expressed its intent that magistrate[ judges] *may* conduct evidentiary hearings in postconviction proceedings" (emphasis added) (citation omitted)). The undersigned defers to the District Court on whether the undersigned or the District Court should conduct the hearing.

E.    Whether to Appoint Counsel

"If an evidentiary hearing is warranted, the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. § 3006A." Rule 8(c), Rules Governing Section 2254 Cases. If "the interests of justice so require," "representation may be provided for any financially eligible person who" "is seeking relief under section . . . 2254." 18 U.S.C. §3006A.

In the Traverse, Petitioner requests court appointed counsel. Dkt. 22 at 26. Neil Martin Fox is Petitioner's retained counsel in this case. Mr. Fox has represented Petitioner throughout this case.[4] Importantly, Mr. Fox has not sought to withdraw from this case since filing his notice

---

[4] Through Mr. Fox, Petitioner filed her Petition. Dkt. 1. At the initiation of this case, Mr. Fox sought permission to withdraw from the case and requested Petitioner be appointed counsel. Dkt. 3. The Court granted Mr.

1  of appearance on January 20, 2022. Therefore, Mr. Fox is the attorney of record. Mr. Fox,

2  however, indicates he was only retained to litigate Petitioner's state PRP.

3      If the Honorable David G. Estudillo, the District Judge assigned to this case, adopts this

4  Report and Recommendation, Petitioner is entitled to court appointed counsel as long as she

5  qualifies under 18 U.S.C. § 3006A. As Petitioner is represented by retained counsel, the record

6  does not definitively demonstrate that Petitioner qualifies for appointed counsel. Therefore, if

7  this Report and Recommendation is adopted, the undersigned recommends:

8      (1)    Petitioner be directed to provide evidence—such as an updated financial affidavit

9  and a declaration from Mr. Fox stating if he was providing his services on a *pro bono* basis—

10  showing she qualifies for court appointed counsel pursuant to 18 U.S.C. § 3006A;

11      (2)    If Petitioner qualifies for appointed counsel and Mr. Fox intends to withdraw he

12  should be directed to file a motion to withdraw in accordance with the Local Civil Rule 83.2.;

13      (3)    If Petitioner qualifies for appointed counsel and the Court approves Mr. Fox's

14  withdrawal, then the Court should appoint the Federal Public Defender for the Western District

15  of Washington (FPD) to represent Petitioner.

16  **II.    Claim 2**

17      Petitioner alleges that her "[m]ultiple convictions for assault and murder violated double

18  jeopardy." Dkt. 1 at 7. She reasons that "[t]he murder conviction and assault convictions all

19  stemmed from a single criminal episode with one intention of killing the same person, Mr.

20  Alkins." *Id.* Therefore, Petitioner contends that she "should not have received separate and

21

22  Fox's motion to withdraw but denied Petitioner's motion to appoint counsel. Dkt. 4. Mr. Fox then filed a second
    motion to appoint counsel. Dkt. 8. The Court struck the second motion to appoint counsel and other filings that Mr.

23  Fox submitted because he filed them after the Court granted his motion to withdraw. Dkt. 20 at 1. In striking these
    filings, the Court stated that "Mr. Fox must enter a new formal appearance and refile his submissions before the
    Court can consider any filings by [him]." *Id.* at 1–2. On January 20, 2022, after Respondent filed the Answer, Mr.

24  Fox chose to enter a notice of appearance and file the Traverse. Dkt. 21, 22.

1    increased sentences for the three assault counts and the one murder count." *Id.* Alternatively,

2    Petitioner contends that she "should have been sentenced only for one assault count and not

3    three." *Id.*

4          Petitioner last raised this claim in her PRP. Dkt. 15-1 at 239–47. However, the state court

5    of appeals declined to consider this claim because Petitioner "raised the same issue in her direct

6    appeal." *Tricomo II*, 13 Wash. App. 2d at 234. So, to determine its reasoning for denying this

7    claim, the Court looks to the state court of appeals' decision on direct appeal. *Cf. Wilson v.*

8    *Sellers*, 138 S. Ct. 1188, 1192 (2018).

9          Regarding Petitioner's contention that she should not have received separate and

10   increased sentences for the three assault counts and the one murder count, the state court of

11   appeals asked "whether the convictions were the same in law and in fact." *Tricomo I*, 193 Wash.

12   App. 1037, at *4 (citation omitted). "If there is an element in each offense which is not included

13   in the other, and proof of one offense would not necessarily also prove the other, the offenses are

14   not constitutionally the same and the double jeopardy clause does not prevent convictions for

15   both offenses." *Id.* (citation omitted). the state court of appeals found that Petitioner's

16   "convictions for second degree murder and second degree assault [were] legally different." *Id.* It

17   reasoned: "Proof of second degree assault does not necessarily prove second degree murder

18   because a person can assault another person without actually causing death. Second degree

19   murder, on the other hand, requires proof of intent to cause death, and actual death." *Id.*[5]

20         As relevant here, the Double Jeopardy Clause "protects against multiple punishments for

21   the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). "With respect to

22   cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than

23   

24   _____
          [5] Petitioner has not argued that Division Two incorrectly concluded second-degree murder and second-degree assault each has an element not included in the other. *See* Dkt. 22 at 27–28.

1    prevent the sentencing court from prescribing greater punishment than the legislature intended."

2    *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). Where, as here, there is no "clear indication of []

3    legislative intent" to impose "cumulative punishment," courts apply the test in *Blockburger v.*

4    *United States*, 284 U.S. 299 (1932). *See Hunter*, 459 U.S. at 366–67. Under *Blockburger*, "where

5    the same act or transaction constitutes a violation of two distinct statutory provisions, the test to

6    be applied to determine whether there are two offenses or only one, is whether each provision

7    requires proof of [an element] which the other does not." *See* 284 U.S. at 304.

8        Here, the state court of appeals determined that second-degree murder and second-degree

9    assault each "require[d] proof of a different element" that the other did not. *See id.* at 304; *see*

10   *also Tricomo I*, 193 Wash. App. 1037, at *4 (citation omitted). The state court of appeals'

11   determination of the elements of second-degree murder and second-degree assaults bind this

12   Court. *See Brown v. Ohio*, 432 U.S. 161, 167 (1977) ("[T]he Ohio Court of Appeals has

13   authoritatively defined the elements of the two Ohio crimes[.]"); *see also Bradshaw v. Richey*,

14   546 U.S. 74, 76 (2005). Therefore, the state court of appeals reasonably rejected Petitioner's

15   contention that she should not have received separate and increased sentences for the three

16   assault counts and the one murder count.

17       Petitioner contends that the state court of appeals' decision is inconsistent with the

18   Supreme Court's decision in *Brown*. Dkt. 22 at 27–29. But *Brown* is distinguishable; the offenses

19   there were the "same" under *Blockburger* because one offense "require[d] no proof beyond that

20   which [was] required for [the other]." 432 U.S. at 168. As noted, Petitioner does not argue that

21   second-degree murder and second-degree assault are the same under *Blockburger* and instead

22   discusses other aspects of *Brown*'s reasoning. *See* Dkt. 22 at 27–28. But *Brown*'s determination

23   that the two offenses were the same under *Blockburger* was essential to its holding. *See, e.g.*, 432

24

1   U.S. at 169 ("The applicable Ohio statutes, as written and as construed in this case, make the

2   theft and operation of a single car a single offense."). Because Petitioner has not discussed this

3   key aspect of *Brown*'s holding, Petitioner has not met her burden under § 2244(d) to show that

4   the state court of appeals' decision was unreasonable. *See Cullen v. Pinholster*, 563 U.S. 170,

5   181 (2011) (petitioners have the burden of proof under § 2254(d) (citation omitted)).

6       Alternatively, Petitioner contends that she "should have been sentenced only for one

7   assault count and not three." Dkt. 1 at 7.

8       Petitioner "was charged, in relevant part, with three counts of second degree assault

9   stemming from the events of one evening." *Tricomo I*, 193 Wash. App. 1037, at *2. "Count II

10  charged second degree assault based on the use of a razor knife to inflict neck wounds." *Id.*

11  (internal quotation marks omitted). "Count III charged second degree assault based on the use of

12  a razor knife to inflict facial wounds." *Id.* (internal quotation marks omitted). "And count IV

13  charged second degree assault based on the use of a razor knife to inflict hand wounds." *Id.*

14  (internal quotation marks omitted). The State charged Petitioner with second-degree assault

15  based on use of a razor knife to inflict neck wounds under R.C.W. § 9A.36.021(1)(a). The State

16  charged the remaining assault offenses under R.C.W. § 9A.36.021(1)(c). Dkt. 15-3 at 560–61.

17  Petitioner "pleaded guilty as charged and agreed that the trial court could rely on the State's

18  statement of probable cause and police reports to find the facts necessary to establish a factual

19  basis for her plea." *Tricomo II*, 193 Wash. App. 1037, at *3.

20      The state court of appeals held that Petitioner's convictions on count II (assault based on

21  neck wounds) and count IV (assault based on hand wounds) did not violate double jeopardy

22  because "the assault that resulted in neck wounds was a separate course of conduct from the

23  assault that resulted in wrist wounds." *Id.* It reasoned:

24

1

> [I]f multiple assaultive acts constitute only one course of conduct, then double
> jeopardy protects against multiple convictions. There is no bright-line rule for when
> multiple assaultive acts constitute one course of conduct. In determining whether
> multiple assault acts constitute one course of conduct, we consider the length of
> time over which the acts occurred, the location of the acts, the defendant's intent or
> motivation for the assaultive acts, whether the acts were uninterrupted, and whether
> there was an opportunity for the defendant to reconsider her acts. No single factor
> is dispositive, and the ultimate determination should depend on the totality of the
> circumstances, not a mechanical balancing of the various factors.

> Here, the assaultive acts occurred over several hours and in different places in the
> victim's home. According to [Petitioner], there were hours in between the act of
> slitting the victim's throat and cutting the victim's wrists. Further, [Petitioner's]
> account of the events indicate that her motivation for the two attacks was different.
> [Petitioner] stated that she brought the knife with her into the upstairs bedroom as
> preparation to kill the victim, but that she cut the victim's wrists because the victim
> was attempting to take the knife from her. And, she had considerable time to
> reconsider her actions. For instance, she had time to reconsider during the hours the
> victim spent walking around the house after she slit his throat in the upstairs
> bedroom and before she cut his wrists during the struggle at the entryway.

*Id.* (citations and internal quotation marks omitted).

Where, as here, a defendant alleges that she has engaged in "a single act or transaction"

or one course of conduct but has been convicted of "multiple violations of the same statutory

provision," courts ask what the legislature "'has made the allowable unit of prosecution.'" *See*

*United States v. Keen*, 104 F.3d 1111, 1118 (9th Cir. 1996) (quoting *United States v. Universal*

*C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952)).

In Washington, "[t]here is no bright-line rule for when multiple assaultive acts constitute

one course of conduct." *State v. Villanueva-Gonzalez*, 180 Wash. 2d 975, 985 (2014) (en banc).

Courts generally consider: (1) the "length of time over which the assaultive acts took place"; (2)

whether "the assaultive acts took place in the same location"; (3) the "defendant's intent or

motivation for the different assaultive acts"; (4) whether "the acts were uninterrupted or whether

there were any intervening acts or events"; and (5) whether "there was an opportunity for the

defendant to reconsider his or her actions." *Id.*

1    Here, applying at least four of these factors to Petitioner's conduct, the state court of

2    appeals concluded that "the assault that resulted in neck wounds was a separate course of

3    conduct from the assault that resulted in wrist wounds." *Tricomo I*, 193 Wash. App. 1037, at *3.

4    The record supports its factual findings regarding Petitioner's conduct. *See* Dkt. 15-3 at 556–57

5    (probable cause affidavit). Based on these undisputed facts, the state court of appeals reasonably

6    applied *Villanueva-Gonzalez*'s "controlling [judicial] gloss" for whether multiple assaultive acts

7    constitute one course of conduct. *Cf. Bell v. United States*, 349 U.S. 81, 83 (1955).

8    Petitioner contends that this ruling was contrary to *Brown*. Dkt. 22 at 27–29. However,

9    *Brown* is inapposite. *Brown* involved two different statues that were the same under the

10   *Blockburger* test. 432 U.S. at 168. By contrast, "[R.C.W. 9A.36.021] defines a single crime—

11   second-degree assault—and provides [] different means by which a person can commit that

12   crime." *United States v. Robinson*, 869 F.3d 933, 941 (9th Cir. 2017) (internal quotation marks

13   omitted). "Because only a . . . single statute is at issue here, [courts] do not analyze this [claim]

14   under [*Blockburger*'s] 'same evidence' test." *See Sanabria v. United States*, 437 U.S. 54, 70 n.24

15   (1978) (collecting cases). Petitioner has not identified any other Supreme Court holdings that the

16   state court of appeals' decision was contrary to, or an unreasonable application of, and the

17   Court's research did not reveal any. *See Pinholster*, 563 U.S. at 181 (petitioners have the burden

18   of proof under § 2254(d)).

19   In rejecting Petitioner's argument that her assault conviction for inflicting facial wounds

20   violated double jeopardy, the state court of appeals provided a different rationale. The state court

21   of appeals held that Petitioner waived this double jeopardy challenge because she pleaded guilty

22   and the alleged double jeopardy violation was not clear from the record on appeal. *See Tricomo*

23   *I*, 193 Wash. App. 1037, at *3 (citing *State v. Knight*, 162 Wash. 2d 806, 811 (2008)). *Knight*

24

1    cited *United States v. Broce*, 488 U.S. 563 (1989), for the proposition that "[a]fter a guilty plea

2    the double jeopardy violation must be clear from the record presented on appeal, or else be

3    waived." 162 Wash. 2d at 811 (citing 488 U.S. at 575–76).

4         "A plea of guilty and the ensuing conviction comprehend all of the factual and legal

5    elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." *Broce*,

6    488 U.S. at 569. "Accordingly, when the judgment of conviction upon a guilty plea has become

7    final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to

8    whether the underlying plea was both counseled and voluntary." *Id.* "If the answer is in the

9    affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack." *Id.*

10        In *Broce*, the defendants "pleaded guilty to two charges of conspiracy on the explicit

11   premise of two agreements which started at different times and embraced separate objectives."

12   *Id.* at 571. Thus, *Broce* found that they "conceded that [they had] committed two separate

13   crimes." *See id.* at 570. Consequently, their "double jeopardy challenge [was] foreclosed by

14   [their] guilty pleas and [their] judgments of conviction." *Id.* at 565.

15        *Broce* stated that "[t]here are exceptions where on the face of the record the court had no

16   power to enter the conviction or impose the sentence." *Id.* at 569. It acknowledged one such

17   exception in *Menna v. New York*, 423 U.S. 61 (1975). *Broce*, 488 U.S. at 575. *Menna* held that

18   "a plea of guilty to a charge does not waive a [double jeopardy] claim that judged on its face [] is

19   one which the State may not constitutionally prosecute." 423 U.S. at 62 n.2. However, *Broce*

20   distinguished *Menna* because, in *Menna*, "the indictment was facially duplicative of the earlier

21   offense of which the defendant had been convicted and sentenced so that the admissions made by

22   [the defendant's] guilty plea could not conceivably be construed to extend beyond a redundant

23   confession to the earlier offense." *Broce*, 488 U.S. at 575–76. By contrast, in *Broce*, the

24

1    defendants "pleaded guilty to indictments that on their face described separate conspiracies." *Id.*

2    at 576. Therefore, the defendants in *Broce* could not "prove their claim by relying on those

3    indictments and the existing record." *Id.* So the above exception to waiver did not apply. *See id.*

4        Here, the state court of appeals reasonably applied *Broce*. Trial counsel represented

5    Petitioner when she pleaded guilty and, as discussed below, her guilty plea was voluntary. *See*

6    *infra* pp. 35–37. Furthermore, the amended information alleged that count III involved the use of

7    a razor knife to inflict facial wounds and that Petitioner committed this assault "separate and

8    apart" from the other assault charges. Dkt. 15-3 at 560. Because Petitioner pleaded guilty to the

9    amended information, *id.* at 604–05, her claim is "foreclosed by the admissions inherent in [her]

10   guilty plea[.]" *See Broce*, 488 U.S. at 576. True, the state court of appeals found that the

11   probable cause affidavit did not "include any information about count III." *Tricomo I*, 193 Wash.

12   App. 1037, at *3. However, the state court of appeals did not reference the indictment's

13   allegation that the assaults were committed "separate and apart" each other. Dkt. 15-3 at 560–61.

14       Furthermore, the state court of appeals' rejection of this claim would be reasonable even

15   if the indictment did not contain the "separate and apart" allegation. In that event, because she

16   voluntarily pleaded guilty, Petitioner would still have to show that the trial court had "no power"

17   "on the face of the record . . . to enter the conviction or impose the sentence." *See Broce*, 488

18   U.S. at 569, 575. She has not made this showing. She merely states that the probable cause

19   affidavit "did not contain any facts regarding the facial wounds." Dkt. 22 at 28. But this was the

20   state court of appeals' point: there were no facts about Petitioner's infliction of facial wounds.

21   Thus, there were no facts from which the trial court could have concluded that count III was "one

22   course of conduct" with one or both of the other assaults. *See Villanueva-Gonzalez*, 180 Wash.

23   2d at 985. Petitioner could have provided these facts during her plea colloquy but did not. *See*

24

1   Dkt. 15-3 at 611; *cf. Broce*, 488 U.S. at 574 ("A failure by counsel to provide advice may form

2   the basis of a claim of ineffective assistance of counsel, but absent such a claim it cannot serve as

3   the predicate for setting aside a valid plea."). This case is not comparable to *Menna*, where "the

4   indictment was facially duplicative of the earlier offense of which the defendant had been

5   convicted and sentenced." *See Broce*, 488 U.S. at 575–76.

6       Accordingly, Petitioner has not shown that the state court of appeals' rejection of claim 2

7   was contrary to, or an unreasonable application of, clearly established federal law or an

8   unreasonable determination of the facts.

9   **III.     Claim 3**

10      Petitioner contends that her guilty plea was not knowing and voluntary in violation of due

11  process. Dkt. 1 at 8. In support, she alleges that she "was [incorrectly] told that the maximum

12  sentence for the murder count was life in prison and 10 years for the assault counts." *Id.* She

13  contends that, under *Blakely v. Washington*, 542 U.S. 296 (2004), "the maximum sentences were

14  the top ends of the standard ranges (357 and 70 months). *Id.* She adds: "I was misadvised of the

15  maximum sentences and the guilty plea was not knowing and voluntary, and I should have been

16  allowed to withdraw the guilty plea." *Id.*

17      On direct appeal, the state court of appeals rejected this claim. *Tricomo I*, 193 Wash.

18  App. 1037, at *1. It reasoned:

19      [Petitioner] pleaded guilty to second degree murder. At the plea hearing, the trial
        court informed her that the applicable maximum term of confinement was a life
20      sentence and the standard range of actual confinement was 257 to 357 months, with
        the State recommending a sentence of 357 months. [Petitioner] acknowledged that
21      she understood. The court then sentenced [Petitioner] within the standard range.

22      [Petitioner] contends that her plea was not made knowingly, voluntarily, and
        intelligently because the trial court misinformed her of the applicable maximum
23      sentence for the offense with which she was charged. [Petitioner] asserts that the
        applicable maximum sentence was the top end of the standard range, not the

24

statutory maximum sentence declared by the legislature. Citing [*Blakely*], [Petitioner] claims that the trial court misinformed her when it told her that life imprisonment was the applicable maximum sentence for second degree murder.

[The Washington Court of Appeals rejected this argument in *State v. Kennar*, 135 Wash. App. 68 (2006)]. In [*Kennar*], the court held that CrR 4.2 requires the trial court to inform a defendant of both the applicable standard sentence range and the maximum sentence for the charged offense as determined by the legislature . . . . [N]oting that *Blakely* is a sentencing case, not a plea-entry case," [*Kennar* distinguished *Blakely*, reasoning that],

> [b]ecause a defendant's offender score and standard sentence range are not finally determined by the court until the time of sentencing, the Sixth Amendment concerns addressed in *Blakely* do not apply until that time. Thus, when Kennar entered his guilty plea, the maximum peril he faced was, in fact, life in prison. He was correctly informed of this by the trial court . . . .

Similarly here, at the time of her plea, [Petitioner] was informed of the maximum sentence and the standard sentence range for the charged offense. . . . *Tricomo I*, 193 Wash. App. 1037, at *5.

"[I]f a defendant's guilty plea is not equally voluntary and knowing, it has been obtained in violation of due process and is therefore void." *McCarthy v. United States*, 394 U.S. 459, 466 (1969). "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Parke v. Raley*, 506 U.S. 20, 29 (1992) (citation omitted). This happens when the defendant has "a full understanding of what the plea connotes and of its consequence[s]" and chooses to plead guilty without being coerced to do so. *See Boykin v. Alabama*, 395 U.S. 238, 242–44 (1969); *see also Brady v. United States*, 397 U.S. 742, 755 (1970) (citation omitted). "The voluntariness of [the defendant's] plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 at 749 (citations omitted).

1    "In assessing the voluntariness of the plea, statements made by a criminal defendant

2    contemporaneously with his plea should be accorded great weight." *Chizen v. Hunter*, 809 F.2d

3    560, 562 (9th Cir. 1986) (citing *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977)). "[T]he

4    representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any

5    findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent

6    collateral proceedings." *Blackledge*, 431 U.S. at 73–74. "Solemn declarations in open court carry

7    a strong presumption of verity." *Id.* at 74.

8         Here, the state court of appeals reasonably rejected this claim. During her plea colloquy,

9    Petitioner stated that: (1) she had a college degree; (2) trial counsel had reviewed the plea

10   agreement with her and answered all her questions about the case; (3) she knew she was waiving

11   constitutional rights by pleading guilty; and (4) no one had promised her anything to get her to

12   plead guilty or forced her to plead guilty. Dkt. 15-3 at 605–06, 610.

13        Furthermore, the trial court informed her that, on count I (second-degree murder), her

14   "standard range of actual confinement . . . would be 257 to 357 months, . . . and a maximum term

15   of confinement of life." *Id.* at 607. Further, the trial court informed her that the prosecutor was

16   "going to recommend" "at the time of sentencing" "357 months on Count 1." *Id.* at 608. Yet

17   Petitioner acknowledged that she was "not agreeing that that [was] what the court should order

18   and that . . . Mr. O'Connor [would] be able to argue . . . [for] a lesser sentence." *Id.*

19        *Kennar* held that "CrR 4.2 requires the trial court to inform a defendant [at the time the

20   plea is made] of both the applicable standard sentence range and the maximum sentence for the

21   charged offense as determined by the legislature." *See* 135 Wash. App. at 72–75. The Court

22   cannot reconsider this state-law determination on habeas review. *See, e.g.*, *Richey*, 546 U.S. at

23   76. As in *Kennar*, the trial court informed Petitioner of applicable standard sentencing range (257

24

1  to 357 months) and the statutory maximum on count I (life imprisonment). So the state court of

2  appeals reasonably concluded that the trial court did not misadvise Petitioner.

3          Petitioner contends that the state court of appeals' decision is contrary to *Blakely*. Dkt. 22

4  at 30. However, *Blakely* involved a Sixth Amendment challenge to a state court's imposition of a

5  90-month sentence after judicial factfinding even though the "facts admitted in [the guilty] plea,

6  standing alone, supported a maximum sentence of [only] 53 months." *See* 533 at 298, 303. Here,

7  however, the trial court did not engage any judicial factfinding resulting in the imposition of a

8  sentence greater than the "[357]-month statutory maximum of the standard range." *See id.* at 303.

9  *Blakely* is inapplicable. And the remaining cases Petitioner cites simply state general principles

10  governing due process challenges to the voluntariness of guilty pleas and are readily

11  distinguishable factually. *See* Dkt. 22 at 29–30.

12          In sum, Petitioner has not shown that the state court of appeals' rejection of claim 3 was

13  contrary to, or an unreasonable application of, clearly established federal law or an unreasonable

14  determination of the facts.

15                          **EVIDENTIARY HEARING ON CLAIMS 2 AND 3**

16          The decision to grant an evidentiary hearing lies within the discretion of the Court.

17  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Court "must consider whether such a

18  hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

19  entitle the applicant to federal habeas relief." *Id.* at 474 (citation omitted). "It follows that if the

20  record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

21  court is not required to hold an evidentiary hearing." *Id.*

22

23

24

1    Here, based on the facts in the state court record, Petitioner has not shown that the state

2    court of appeals unreasonably rejected claims 2 and 3. Because the record precludes relief on

3    these claims, an evidentiary hearing is improper.

4    **CERTIFICATE OF APPEALABILITY**

5    The Court also recommends that no certificate of appealability be granted as to claims 2

6    and 3. A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

7    dismissal of the federal habeas petition only after obtaining a certificate of appealability from a

8    district or circuit judge. A certificate of appealability may issue only if a petitioner has made "a

9    substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). When a

10   district court rejects a constitutional claim on the merits, to obtain a certificate of appealability,

11   the petitioner "must demonstrate that reasonable jurists would find the district court's assessment

12   of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 474 (2000).

13   Here, because Petitioner has not so shown, a certificate of appealability should be denied on

14   claims 2 and 3.[6]

15   **CONCLUSION**

16   As discussed above, it is **recommended** that the Petition (Dkt. 1) be **denied in part**, with

17   the result that claims 2 and 3 be **denied** and that a certificate of appealability should be **denied**

18   on the same claims. It is further **recommended** that an evidentiary hearing be **held** on claim 1 as

19   described above. If this Report and Recommendation is adopted, the undersigned further

20   recommends:

21

22

23    [6] Because the undersigned has recommended an evidentiary hearing on claim 1, it is premature to make a
recommendation about a certificate of appealability on that claim or about petitioner's IFP status for purposes of an
24    appeal.

(1)    Petitioner be directed to provide evidence—such as an updated financial affidavit and a declaration from Mr. Fox stating if he was providing his services on a *pro bono* basis—showing she qualifies for court appointed counsel pursuant to 18 U.S.C. § 3006A;

(2)    If Petitioner qualifies for appointed counsel and Mr. Fox intends to withdraw he should be directed to file a motion to withdraw in accordance with the Local Civil Rule 83.2.;

(3)    If Petitioner qualifies for appointed counsel and the Court approves Mr. Fox's withdrawal, then the Court should appoint the Federal Public Defender for the Western District of Washington (FPD) to represent Petitioner.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the Parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v. Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012). Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **April 29, 2022** as noted in the caption.

Dated this 8th day of April, 2022.

David W. Christel
United States Magistrate Judge