1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LIA YERA TRICOMO,

                    Petitioner,

     v.

JENEVA COTTON,

                   Respondent.

CASE NO. 3:21-CV-5792-DGE-DWC

REPORT AND RECOMMENDATION

Noting Date: November 18, 2022

14    Before the Court is Petitioner Lia Year Tricomo's petition for writ of habeas corpus

15 under 28 U.S.C. § 2254 ("Petition"). Dkt. 1. The Petition contains three grounds for relief. *Id.* at

16 pp. 5, 7–8. After consideration of the record, the Court finds Ground 1 is procedurally barred and

17 the state court's adjudication of Grounds 2 and 3 was not contrary to, nor an unreasonable

18 application of, clearly established federal law. Therefore, it is **recommended** that the Petition be

19 denied, no evidentiary hearing be held, and no certificate of appealability be issued.

20    **I.**    **BACKGROUND**

21    A.  Factual Background

22    Petitioner is challenging a Thurston County Superior Court judgment and sentence

23 arising from one count of murder in the second degree, three counts of assault in the second

24

degree, and one count of taking a motor vehicle without permission. *See* Dkt. 1. The Court of

Appeals for the State Washington ("state court appeals") summarized the facts supporting of

Petitioner's underlying case as follows:

### I. BACKGROUND

In late March 2013, Tricomo attempted suicide and was admitted to a hospital. As part of her treatment, her doctor prescribed her Paxil, an antidepressant. At a follow-up medical appointment on April 3, her Paxil prescription was renewed. She saw her therapist the next day, who encouraged her to stay on her antidepressants.

On April 25, Tricomo saw her therapist again who noted,

> Discussed and processed her ambivalence about the medication she is on. Looked at what she identifies as the root cause of her anger; She is angry that she is alive. She does not plan to harm herself, and in fact, talked about ways she used to inflict pain on herself. She does not want to do that anymore and does not want to take her life. However, she still in [sic] not happy about being alive.
>
> ....
>
> [Tricomo] does not like the way the medication makes her feel even though she knows she feels calmer and happier. She expressed confusion about the experience of being happier. It is uncomfortable and unfamiliar. It seems to also take away her energy for acting out in anger.

Am. PRP & Reply, Ex. 11, at 116.

On April 29, Tricomo brought some of her belongings to the home of her former counselor, John Alkins, to move in with him. Tricomo and Alkins drank vodka together. They had a sexual encounter in his home. During this sexual encounter, Tricomo attempted to tie him up with a rope, but he stated he did not like it, so she untied him. After untying Alkins, Tricomo grabbed a razor blade knife she had hidden in the bedroom, and she slit his throat approximately six times. Alkins walked around his house for several hours trying to stop the bleeding. Tricomo followed him throughout the house to ensure he would not leave. There was a struggle for the razor blade knife at the front door, and Alkins's wrist was cut during this struggle. Alkins then went back upstairs. Tricomo strangled Alkins with an extension cord, killing him.

The next day, Tricomo was arrested, and she confessed to the police. During her interview with the police, Tricomo mentioned the negative effect of her medication. Later, when Tricomo was in jail prior to trial, a psychiatric note said, "Paxil, made

her want to kill people, had horrible withdrawal," and the Paxil was discontinued. Am. PRP & Reply, Ex. 14, at 146.

## II. GUILTY PLEA

The State charged Tricomo by amended information with second degree murder, three counts of second degree assault, and second degree taking a motor vehicle without the owner's permission.[ ] The three counts of second degree assault were based on Tricomo's use of a razor blade knife to inflict neck wounds, use of a razor blade knife to inflict facial wounds, and use of a razor blade knife to inflict hand wounds. Tricomo pleaded guilty to the amended information.

For the second degree murder count, the parties agreed on a standard range sentence of 257 to 357 months. The plea agreement stated that while the State was going to recommend 357 months on the second degree murder count, the "[d]efense is free to argue for a lesser sentence," and the agreement recognized that the trial court could impose an exceptional sentence below the standard range. Clerk's Papers (CP) at 30. The State's sentencing memorandum provided, "Pursuant to plea agreement, Defendant may argue for *no less than* 257 months prison which is the low end of the standard range." *Id.* at 128.

During the plea colloquy, when discussing that the State would recommend 357 months, the court addressed Tricomo and said, "And you understand that you are not agreeing that that is what the court should order and that, in fact, [defense counsel] will be able to argue that the court should impose a lesser sentence on your behalf." Verbatim Report of Proceedings (VRP) (Nov. 6, 2014) at 8. Tricomo confirmed that she understood the parameters of her plea agreement as explained by the trial court.

## III. SENTENCING

Before the sentencing hearing, both Tricomo and the State filed sentencing briefs. In her brief, Tricomo asked the court to consider expert Dhyana Fernandez's mitigation report and the reports of Dr. David Dixon and Dr. Delton Young. All three experts discussed the effects that the use and withdrawal from Paxil may have had on Tricomo's ability to form intent at the time of the crime.

Dixon, the defense expert, and Young, the State's expert, reached contradictory conclusions regarding Paxil's effects on Tricomo's mental state. Prior to pleading guilty, Tricomo was evaluated for diminished capacity by Dixon, a psychologist. Dixon discussed Paxil in his report and concluded, "Use of and withdrawal from Paxil at the time of the alleged crime may have diminished her ability to form intent, a requisite mental state. Paxil withdrawal exacerbated her mood disorder into a manic state with psychosis." CP at 78.

The State's expert, Young, also conducted a forensic psychological evaluation. He disagreed with Dixon about Paxil stating, "[T]here was no withdrawal: she was taking the medication every day (including on April 29th) as prescribed. It is

possible that the medication generated aversive side effects (e.g., feeling 'nothing'); but it is more likely that the psychotic symptoms stemmed from alcohol abuse in a psychologically vulnerable individual." *Id.* at 94.

Fernandez wrote a mitigation report for sentencing, which included a section on Paxil. Fernandez cited to several peer reviewed journal articles and articles from web-based sources, but the report contained no analysis. The State objected to Fernandez's report because it did not believe Fernandez was qualified to opine about the effects of Paxil.

At sentencing, the court said it would not consider the section on Paxil in Fernandez's report. The court reasoned that it did not "find that [Fernandez] has any expertise in that particular area and she basically only sets forth a number of articles suggesting that they may have some relevance." VRP (Jan. 28, 2015) at 39. However, the trial court did consider the expert reports from Young and Dixon, and it noted that "the doctors reference Paxil, both doctors, and the adverse side effects of this medication." *Id.* at 77.

The State asked the court to sentence Tricomo to 357 months and defense counsel asked the court to sentence Tricomo to 257 months. The court imposed the top of the standard range—357 months—for the murder conviction, with the other counts to run concurrently.

IV. APPEAL AND MANDATE

Tricomo appealed her convictions and sentence, arguing that her convictions violated double jeopardy, that her guilty plea was not voluntary, and that the trial court erred in refusing to consider the portion of Fernandez's report regarding Paxil. *State v. Tricomo*, No. 47238-4-II, slip op. at 1, 2016 WL 2347041 (Wash. Ct. App. Apr. 26, 2016) (unpublished) http://www.courts.wa.gov/opinions/pdf/47238-4.16.cor.pdf. We affirmed her convictions and sentence. *Tricomo*, slip op. at 1. The mandate issued on January 5, 2017.

*Matter of Tricomo*, 13 Wash. App. 2d 223, 228–31 (2020) (footnote omitted).

B. Procedural Background

1. *Direct Appeal*

Petitioner challenged her judgment and sentence on direct appeal. *See* Dkt. 15-1, p. 51 (Exhibit 4). The state court of appeals affirmed Petitioner's judgment and sentence. *Id*. at p. 130 (Exhibit 7). Petitioner sought discretionary review by the state supreme court. *See id*. at p. 180 (Exhibit 10). On November 2, 2016, the state supreme court denied review without comment. *Id.*

1     at p. 233 (Exhibit 11). The state court of appeals issued the mandate on January 5, 2017. *Id*. at p.

2     235 (Exhibit 12).

3             2.   *Personal Restraint Petition*

4           On January 2, 2018, Petitioner, proceeding *pro se*, filed a personal restraint petition

5     ("PRP") seeking state post-conviction relief. *See* Dkt. 15-1, p. 238 (Exhibit 13). Petitioner

6     retained counsel, Neil Fox, and, on December 31, 2018, Mr. Fox filed an amended PRP on

7     Petitioner's behalf. *See* Dkt. 15-2, p. 2 (Exhibit 20). The PRP was referred to a panel of judges at

8     the state court of appeals for determination on the merits. *See id*. at 376 (Exhibit 26). After

9     supplemental briefing, the state court of appeals denied the PRP on May 12, 2020. *See* Dkts. 15-

10    3, p. 2 (Exhibit 31); 15-3, p. 47 (Exhibit 32); 15-1, p. 23 (Exhibit 3). Petitioner sought

11    discretionary review from the state supreme court, which the commissioner of the state supreme

12    court denied on June 4, 2021. *See* Dkts. 15-3, p. 268 (Exhibit 37); 15-3, p. 350 (Exhibit 28); 15-

13    3, p. 379 (Exhibit 39), 15-3, p. 397 (Exhibit 40); 15-3, p. 446 (Exhibit 41); 15-3, p. 457 (Exhibit

14    42); 15-3, p. 469 (Exhibit 43). Petitioner moved to modify the commissioner's decision. *See* Dkt.

15    15-3, p. 474 (Exhibit 44). On September 1, 2021, the state supreme court denied the motion to

16    modify without comment. *See id*. at p. 550 (Exhibit 47). The state court of appeals issued the

17    certificate of finality on October 26, 2021. *Id*. at p. 552 (Exhibit 48).

18            3.   *Federal Petition*

19          On October 26, 2021, Petitioner filed her Petition (Dkt. 1) raising the following grounds

20    for relief:

21        1.   Ineffective assistance of counsel in violation of the right to counsel protected
           by the Sixth and Fourteenth Amendments to the United States Constitution
22            because her lawyer did not hire the proper expert to evaluate the effect of the
           prescribed medication, Paxil, on Petitioner's behavior.

23

24

2. Multiple convictions for assault and murder violated double jeopardy as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.
3. The guilty plea was not knowing and voluntary in violation of the Due Process Clause of the Fourteenth Amendment.

Dkt. 1. On December 23, 2021, Respondent filed, and served on Petitioner's counsel through electronic means, an Answer and Memorandum of Authorities and a Submission of Relevant State Court Record. Dkts. 14, 15. In the Answer, Respondent asserted Ground 1 is unexhausted and procedurally barred and the state court's adjudication of Grounds 2 and 3 was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 14. Petitioner filed her Traverse on February 18, 2022. Dkt. 22.

On April 8, 2022, the undersigned issued a Report and Recommendation ("R&R"). Dkt. 24. In the R&R, the undersigned recommended Grounds 2 and 3 be denied, but that an evidentiary hearing be held regarding Ground 1. *Id*. As to Ground 1, specifically, the undersigned found the claim was unexhausted and procedurally defaulted, but determined the procedural default was excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). *See id*. at pp. 23-24. The undersigned recommended the District Court hold an evidentiary hearing on Ground 1 and decide, *de novo*, Ground 1 on the merits. *Id*. at p. 25. Respondent filed Objections to the R&R and Petitioner filed a Response to the Objections. Dkts. 25, 28. Petitioner did not file objections.

Then, on May 23, 2022, while the R&R was still pending, Respondent filed a Notice of Supplemental Authority, to which Petitioner filed a response. Dkts. 29, 30. In the Notice of Supplemental Authority, Respondent informed this Court the United States Supreme Court issued a decision in *Shinn v. Ramirez*, 142 S.Ct. 1718 (2022) that Respondent believed was relevant to this Court's decision in this matter. Dkt. 29. The Honorable David G. Estudillo, the Chief District Judge assigned to this case, found *Shinn* may impact the precedent relied on by the

1    undersigned in the R&R. Dkt. 31. As a result, Chief Judge Estudillo declined to adopt the R&R

2    and referred this matter back to the undersigned to review and possibly reconsider arguments

3    addressed in the R&R. *Id.*

4        The Court permitted the parties to file supplemental briefing. Dkt. 33. Petitioner filed a

5    supplemental brief and supplemental reply. Dkts. 34, 38. Respondent filed a supplemental

6    response. Dkt. 36. Petitioner filed documents from the state court record. Dkts. 35, 37.

7    **II.    LEGAL STANDARD UNDER 28 U.S.C. § 2254(d)**

8        "The statutory authority of federal courts to issue habeas corpus relief for persons in state

9    custody is provided by 28 U.S.C. § 2254 . . . ." *Harrington v. Richter*, 562 U.S. 86, 97 (2011).

10   Subject to two exceptions, § 2254(d) bars a state prisoner from obtaining habeas relief on a claim

11   that was adjudicated on the merits in state court. *Id.* at 97–98.

12       The first exception, § 2254(d)(1), allows habeas relief if the state court's adjudication

13   "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

14   established Federal law, as determined by the Supreme Court of the United States." A state

15   court's adjudication is "contrary to" clearly established Supreme Court precedent if the court

16   either: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme

17   Court; or (2) decides a case differently than the Supreme Court has on materially

18   indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under § 2254's

19   "unreasonable application" clause, courts may grant the writ if the state court identifies the

20   correct governing legal principle from the Supreme Court's decisions but unreasonably applies

21   that principle to the facts of the case. *Id.* at 413.

22       An unreasonable application of federal law differs from an incorrect application of

23   federal law. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation omitted). For the application to be

24

1    unreasonable, "a state prisoner must show that the state court's ruling . . . was so lacking in

2    justification that there was an error well understood and comprehended in existing law beyond

3    any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

4          The second § 2254 exception, § 2254(d)(2), allows habeas relief if the state court's

5    adjudication "resulted in a decision that was based on an unreasonable determination of the facts

6    in light of the evidence presented in the State court proceeding." "[A] state-court factual

7    determination is not unreasonable merely because the federal habeas court would have reached a

8    different conclusion in the first instance." *Ochoa v. Davis*, 16 F.4th 1314, 1325 (9th Cir. 2021)

9    (citation and internal quotation marks omitted). "Rather, a finding is unreasonable if an appellate

10   court could not reasonably conclude that the finding is supported by the record." *Id.* at 1325–26

11   (citation and internal quotation marks omitted).

12         "[T]he relevant state court determination for a habeas petition is the last reasoned state

13   court decision." *Dickens v. Ryan*, 740 F.3d 1302, 1309 (9th Cir. 2014) (en banc). In applying

14   §2254(d) to the last reasoned state court decision, the Court's "analysis is limited to the facts in

15   the state court record." *See Jones v. Ryan*, 1 F.4th 1179, 1189 (9th Cir. 2021); *see also*

16   *McDaniels v. Kirkland*, 813 F.3d 770, 780 n.7 (9th Cir. 2015) (en banc).

17   **III.    DISCUSSION**

18         **A.  Ground 1**

19         In Ground 1, Petitioner states she received ineffective assistance of counsel in violation

20   of the right to counsel protected by the Sixth and Fourteenth Amendments to the United States

21   Constitution when her attorney did not hire the proper expert to evaluate the effect of the

22

23

24

prescribed medication, Paxil.[1] Dkt. 1, p. 5. Respondent contends Petitioner did not properly

exhaust Ground 1 and this ground is procedurally barred from federal review. *See* Dkt. 14, pp.

24-21. In the Traverse, Petitioner does not dispute that Ground 1 is unexhausted and procedurally

defaulted, but states that *Martinez v. Ryan*, 566 U.S. 1 (2012), provides an exception that excuses

the default and allows this Court to consider the merits of Ground 1. Dkt. 22, pp. 16-22.

i.  Legal Standard

A federal court generally may not hear a habeas claim that is "procedurally defaulted."

*See Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011). Procedural default occurs when a state

court denies a claim on procedural grounds. *See, e.g.*, *Zichko v. Idaho*, 247 F.3d 1015, 1021 (9th

Cir. 2001); *Coleman v. Thompson*, 501 U.S. 722, 729–30, 746–47 (1991). "Out of respect for

finality, comity, and the orderly administration of justice, . . . federal courts may excuse

procedural default only if a prisoner can demonstrate cause for the default and actual prejudice as

a result of the alleged violation of federal law." *Shinn*, 142 S.Ct. at 1733 (internal quotations and

citations omitted). To establish "cause," a petitioner must show some objective factor external to

the defense prevented him from complying with the state's procedural rule. *Coleman*, 501 U.S. at

753 (citing *Murray v. Carrier,* 477 U.S. 478, 488 (1986)). To show "prejudice," a petitioner

"must shoulder the burden of showing, not merely that the errors at his trial created a *possibility*

of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire

trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982)

(emphasis in original).

---

[1] The evidence before the Court refers interchangeably to Paxil and paroxetine, an antidepressant
medication. The Court has primarily used the term "Paxil", but uses Paxil and paroxetine interchangeably, especially
when quoting the medical professionals.

1    Petitioner's, or her attorney's, ignorance or inadvertence cannot excuse procedural

2    default. *Shinn*, 142 S.Ct. at 1733 (citing *Coleman*, 501 U.S. at 753). Moreover, "proceedings for

3    which the Constitution does not guarantee the assistance of counsel at all, attorney error cannot

4    provide cause to excuse a default." *Shinn*, 142 S.Ct. at 1733 (internal quotations omitted). There

5    is, however, a limited exception where "ineffective assistance of state postconviction counsel

6    may constitute 'cause' to forgive procedural default of a trial-ineffective-assistance claim, but

7    only if the State requires prisoners to raise such claims for the first time during state collateral

8    proceedings." *Id.* (citing *Martinez*, 566 U.S. at 9). The Supreme Court found this "narrow

9    exception" also "applies if the State's judicial system effectively forecloses direct review of trial-

10   ineffective-assistance claims." *Shinn*, 142 S.Ct. at 1733; *see Trevino v. Thaler*, 569 U.S. 413

11   (2013). "Otherwise, attorney error where there is no right to counsel remains insufficient to show

12   cause." *Shinn*, 142 S.Ct. at 1733 (citing *Martinez*, 566 U.S. at 16).

13   In the first R&R, the undersigned took a broader view of the facts of this case because

14   *Martinez* had been interpreted to allow federal courts to consider new evidence under *Martinez*.

15   *Shinn* has now "greatly restrict[ed] the circumstances in which a federal habeas court deciding

16   *Martinez* claims may consider evidence beyond that already contained in the state court record."

17   *Creech v. Richardson*, 40 F.4th 1013, 1028 (9th Cir. 2022). Chief Judge Estudillo re-referred this

18   matter to the undersigned for consideration of *Shinn*. Dkt. 31. The undersigned has reconsidered

19   whether *Martinez* applies in light of *Shinn* and finds Petitioner has not shown "cause" to

20   overcome the procedural default.

21   "[T]o establish 'cause' to overcome procedural default under *Martinez,* a petitioner must

22   show: (1) the underlying ineffective assistance of trial counsel claim is 'substantial'; (2) the

23   petitioner was not represented or had ineffective counsel during the [post-conviction relief

24

("PCR") ] proceeding; (3) the state PCR proceeding was the initial review proceeding; and (4) state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral proceeding." *Dickens v. Ryan,* 740 F.3d 1302, 1319 (9th Cir. 2014) (citing *Trevino*, 569 U.S. at 423).

The Court begins by addressing the first prong, wherein the petitioner must show the underlying ineffective assistance of trial counsel claim is "substantial," "which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 566 U.S. at 14. "An [ineffective assistance of counsel] claim has merit where (1) counsel's performance was unreasonable under prevailing professional standards, and (2) there is a reasonable probability that but for counsel's unprofessional errors, the result would have been different." *Cook v. Ryan,* 688 F.3d 598, 610 (9th Cir. 2012) (internal citation omitted). "Substantiality" requires a petitioner to demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Detrich v. Ryan,* 740 F.3d 1237, 1245 (9th Cir. 2013) (internal citation omitted).

ii.    <u>Relevant Evidence</u>

Petitioner, in the state PRP, argued trial counsel should have presented different evidence about the effects of Paxil on Petitioner. Dkt. 15-2, pp. 25-41. Petitioner attached new evidence to the amended PRP to show Drs. Dixon and Young did not have experience in the behavioral effects of psychiatric medications, that Petitioner could not have formed the intent to cause Mr. Alkins's death, and that practitioners believe Paxil caused Petitioner's impulsive violent behavior. *Id*. at pp. 58-60. This new evidence also states that Dr. Manuel Saint Martin, M.D.,

1    found Paxil contributed to Petitioner's violent behavior leading to Mr. Alkins's death and the

2    role of the medication was not adequately considered by Drs. Dixon and Young. *Id*. at 371.

3         The record before the trial court shows Petitioner acknowledged anger management

4    problems in January 2013. *Id*. at p. 158. She had a history of violent conduct, including

5    convictions for third-degree assault on a police officer and a charge of domestic violence against

6    her sister. *See id*. at p. 136; Dkt. 15-3, p. 665. She also reported holding a knife to her mother's

7    throat at one point. *See* Dkt. 15-3, p.770. In March 2013, Petitioner told a medical provider that a

8    sexual partner reported Petitioner had assaulted him by going too far during "sex play." Dkt. 15-

9    2, p. 135.

10         When being treated for thoughts of suicide, Petitioner told her medical provider that she

11    had taken Paxil in the past and it worked well, but when she was taking 30 mg she became

12    "giddy and childlike." *Id.* Petitioner was prescribed 20 mg of Paxil on March 25, 2013. *Id*. at p.

13    132. The prescription was renewed on April 3, 2013. *Id*. at pp. 133-35. The next day, again

14    speaking with medical providers, Petitioner asserted that she did not have anger issues recently.

15    *Id*. at 169. On April 25, 2013, four days before the murder, Petitioner discussed her ambivalence

16    about her medication with her medical providers and identified that she was angry she was alive;

17    she reported she did not like that Paxil made her feel "calmer and happier." *Id*. at p. 171.

18         When speaking to detectives the day after the murder, Petitioner admitted that, on the day

19    of the murder, April 29, 2013, she hid a knife/boxcutter in Mr. Alkins' bedroom with intention to

20    harm Mr. Alkins. *See id*. at 188; *see also* Dkt. 15-3, pp. 672-73. Petitioner stated that she drank a

21    "crazy amount" of vodka before she killed Mr. Alkins. Dkt. 15-2, pp. 182-84. She also reported

22    that her medication was not really working and made her feel numb and incapable of feeling. *Id*.

23    at pp. 180, 195-96, 198.

24

1   On September 9, 2013, approximately four months after the murder, a prison psychiatrist

2   evaluated Petitioner. *Id.* at 201–02. According to the history-of-present-illness section of the

3   psychiatrist's report, Paxil made Petitioner "want to kill people." *Id.* at 201. The psychiatrist

4   noted Petitioner had not taken medication during the four months in jail, had "horrible

5   withdrawal" from Paxil, and prescribed new medication. *Id.* at 201-02.

6   Sometime after July 18, 2013 and before February 22, 2014, Patrick O'Connor started

7   representing Petitioner as sentencing counsel. *See* Dkt. 15-3, p. 741. Mr. O'Connor referred

8   Petitioner to Dr. David M. Dixon, a clinical psychologist, for a forensic psychological

9   examination and evaluation for "diminished capacity at the time of the . . . crime." *Id.* After

10  interviewing Petitioner on four occasions, Dr. Dixon submitted his report on April 30, 2014. *Id.*

11  at pp. 741, 761. Dr. Dixon found that, at the time of the crime, Petitioner "suffered the following

12  mental states contributing to her diminished capacity[]": (1) voluntary intoxication that "may

13  have diminished her ability to form intent"; (2) "Use of and withdrawal from Paxil may have

14  diminished her ability to form intent . . . . Paxil withdrawal exacerbated her mood disorder into a

15  manic state with psychosis"; (3) "PTSD from extensive childhood trauma"; and (4) Borderline

16  Personality Disorder. *Id.* at p. 759. Dr. Dixon further found that Paxil and vodka, "PTSD-like

17  symptoms," and Borderline Personality Disorder contributed to a "[d]ecreased ability to inhibit

18  impulses." *See id.* Additionally, Dr. Dixon diagnosed Petitioner with, *inter alia*, Bipolar Disorder

19  II. *Id.* at p. 758.

20  Dr. Delton W. Young, the state's psychologist, reached a different conclusion. Dr. Young

21  noted that Petitioner believed Paxil could have contributed to her attack on Mr. Alkins. *Id.* at p.

22  775. Further, Dr. Young noted Dr. Dixon's conclusion that "Paxil . . . contributed to her actions

23  on that day." *Id.* However, according to Dr. Young, "there was no withdrawal: she was taking

24

the medication every day (including on April 29th) as prescribed." *Id.* Dr. Young added: "It is possible that the medication generated aversive side effects (e.g., feeling 'nothing'); but it is more likely that the psychotic symptoms stemmed from alcohol abuse in a psychologically vulnerable individual." *Id.* Also, Dr. Young disputed Dr. Dixon's finding that Petitioner had PTSD and Bipolar disorder. *Id.*

Petitioner pleaded guilty on November 6, 2014. Dkt. 15-3, p. 601; Dkt. 15-1, pp. 13–21. The parties "agreed that they would each recommend a sentence within the standard range" of 257 to 357 months. *See* Dkt. 15-3, p. 659; Dkt. 15-1, pp. 14, 16.

On January 21, 2015, Mr. O'Connor submitted a sentencing brief and argued for a 257-month sentence. Dkt. 15-3, pp. 723–27. In support, trial counsel submitted the mitigation report of Dhyana Fernandez, in addition to Dr. Dixon's report. *Id.* at pp. 726, 734–39. Ms. Fernandez declared that she had "18 years [of] experience as a mitigation specialist in death penalty cases." *Id.* at p. 731. As relevant here, in preparation of her report, Ms. Fernandez "conducted online research about the negative side effects of . . . Paxil." *Id.* at pp. 731–32. The report provides hyperlinks to those articles, some of which were published in peer-reviewed journals. *Id.* at pp. 737–38. The report also references a book discussing the dangers of antidepressants such as Paxil. *Id.* at p. 738. Additionally, the report relays Petitioner's statements that Paxil caused her to have violent thoughts. *Id.* at p. 737.

On January 23, 2015, the prosecution submitted its sentencing memorandum. *Id.* at pp. 803, 816. The prosecution contended that Washington law did not allow the presentation of mitigation information from "anyone other than [the defendant] or their counsel." *Id.* at p. 814. Furthermore, the prosecution contended that Ms. Fernandez's opinion on the effects of Paxil was

inadmissible because there was no evidence that she was an expert on that subject. *Id.* at pp.
814–15.

 The trial court held a sentencing hearing on January 28, 2015. *Id.* at p. 647. The trial
court ruled that it would accept evidence in mitigation of Petitioner's sentence, but only within
the agreed-upon sentencing range of 257 to 357 months. *See id.* at pp. 657–59. However, the trial
court refused to consider the section in Ms. Fernandez's report about Paxil. *Id.* at p. 658. It
reasoned: "I don't find that she has any expertise in that particular area and she basically only
sets forth a number of articles suggesting that they may have some relevance, but I'm not
considering her report in that regard . . . ." *Id.*

 During the sentencing hearing, the trial court stated:

> I have a lot of information in this case, some of it's been mentioned here today,
> some of it has not been discussed in detail. I have the probable cause statement. I
> have statements regarding what [Petitioner] told people in a mental health
> evaluation situation. I have mentioned earlier that I have two reports from Western
> State Hospital. I have reports from other forensic psychologists. It's clear that there
> was some disagreement among the experts and that was taken into account at the
> time that this plea agreement was made. The issue before me today is not whether
> or not Ms. Tricomo had the ability to form a specific intent to kill. That's been
> established by her pleading guilty to this charge. Much of the information involves
> expert opinion about how to account for why Ms. Tricomo acted out.
>
> . . .
>
> It is clear, [Petitioner], that you had a very difficult upbringing. There were lots of
> situations that cause sympathy for you, that you had to endure those situations.
> There is certainly the fact that you have mental issues. Some of those, in this Court's
> opinion, are self-created. The choice to consume alcohol. You've had periods of
> sobriety, but you've often had periods in which you said I'm just going to drink
> because I can and to amounts that are just astounding to the Court. There are issues
> about taking anti-depressant drugs, Paxil, and that this may somehow have affected
> your view of life.
>
> On the other hand, the State has pointed out that this was a terribly, terribly
> gruesome situation. It involves actions over a period of hours. In involved
> numerous assaultive acts, slitting a throat, and it was not just a flesh wound, a deep
> wound, that, according to the pathologist, mentioned in one of the reports, would

1  have resulted in Mr. Alkins' death eventually through loss of blood had there not
   been intervention, and there wasn't. We have blood in various locations. We have
2  [Petitioner] acknowledging that she acted out using that box cutter at various
   locations. She was afraid that Mr. Alkins might try to leave. She acknowledged
3  that. And there appears to be activities that resulted in other wounds, a wrist wound,
   she says, at the door. She never indicated that Mr. Alkins tried to leave, but there's
4  that inference.

5  One might ask why, why didn't Mr. Alkins ever call for help? I don't know.
   Nevertheless, he ultimately was killed by strangulation by the cord wrapped around
6  his neck and his fingers are inside that cord. There's no explanation but that he was
   trying, in whatever limited way he still had the ability, to resist to keep from being
7  strangled.

8  Folks, there are lots of other factors that I've considered.

9  Dkt. 15-3, pp. 710-11, 712-13. The trail court ultimately sentenced Petitioner to the top of the

10  sentencing rage -- 357 months imprisonment. *Id.* at p. 714.

11  In support of her amended PRP, Petitioner submitted the psychiatric report of Dr. Saint

12  Martin. Dkt. 15-2 at 57. Dr. Saint Martin declares:

13  The chronology of [Petitioner's] psychiatric treatment with paroxetine (Paxil) in
    the month preceding the offense indicates that she had an adverse medication
14  reaction, namely aggressive and violent behavior. . . . [T]he conclusion is that
    paroxetine was responsible for [Petitioner's] aggressive and violent behavior
15  resulting in Mr. Alkin[s's] death.

16  The issue of paroxetine's effect on [Petitioner's] neurobiological state was not
    addressed during her criminal proceeding because she was only examined by
17  psychologists. Dr. Dixon and Dr. Young discussed the role of paroxetine in
    [Petitioner's] offense and arrived at opposing conclusions. I reviewed Dr. Dixon's
18  and Dr. Young's resumes and neither have experience in the behavioral effects of
    psychiatric medications (also known as psychopharmacology). . . . [Petitioner]
19  required a psychiatric evaluation to address the issue of paroxetine's effect on her
    mental state during the commission of the crime, but she never had one during the
20  criminal proceedings.

21  . . . . Postmarketing [sic] studies have revealed that paroxetine produces adverse
    effects of agitation, anger and acting on dangerous violent impulses. These adverse
22  effects include suicidal and homicidal behavior. The adverse effects are more
    common in adolescents and young adults and in patients who have a history of
23  bipolar disorder. Paroxetine's adverse effects are documented in the Federal Drug
    Administration (FDA) medication guide published in June 2012.

24

REPORT AND RECOMMENDATION - 16

[Petitioner] is in the latter two categories of persons whom paroxetine can cause serious adverse effects of violence and suicide. She has a diagnosis of bipolar disorder and a history of severe suicidal thoughts and urges to harm people. . . .

In [Petitioner's] case, it is medically probable that using paroxetine accentuated her impulsive and violent behavior. There is a stronger causal link in the records between her psychiatric condition and paroxetine use than there is for alcohol and marijuana causing her violent behavior. . . . [Petitioner] had been taking paroxetine for sufficient time for both its beneficial and adverse effects to emerge.

On April 30, 2013, [Petitioner] called [Behavioral Health Resources' ("BHS")] crisis line to report that she felt aggressive and suicidal and that she had urges to harm someone. She had already committed the offense. . . . When [Petitioner] was interviewed by the homicide detectives, she mentioned twice that she was reacting to paroxetine and that she wanted to discontinue the medication. While the former may be viewed as self-serving and excusing her conduct, the latter statement of feeling numb is a symptom that is reported in individuals who engage in impulsive behavior induced by antidepressant medication. It is improbable that [Petitioner] would have known this fact at the time she was interviewed. . . .

At the time she committed the offense, [Petitioner] was not withdrawing from paroxetine. This medication has a duration of 21 hours in the body and she had taken it on the morning of the offense. Furthermore, the adverse effects of paroxetine occur when the individual is on the medication—not when they are withdrawing from it. [Petitioner] had been on the medication continuously for at least one month. . . .

[Petitioner's] treatment subsequent to her incarceration at the jail and the DOC indicated that the doctors concluded that paroxetine was linked to her violent impulses and they refrained from prescribing it. In 2018, [Petitioner] expressed a desire to resume taking paroxetine, but the treatment team at the DOC thought that she did not have sufficient appreciation of the risks of adverse effects. Thus, the doctors treating [Petitioner] immediately after the offense and to the present also believe that paroxetine causes her impulsive violent behavior.

*Id.* at 58–60; *see also id.* at 371–72 (Dr. Saint Martin's supplemental report).

Following her conviction and sentencing, Petitioner received psychiatric treatment while in prison. *See* Dkt. 22 at pp. 10–11. On April 19, 2018, Kathryn Hall, M.D., entered a psychiatric progress note. Dkt. 15-2 at p. 205. The note states that Dr. Hall and Petitioner "discussed at length her history of being on paroxetine, which she recalls very positively in terms of decreased

1  depression, but admits it does give her feelings of wanting to kill people." *Id.* The note further

2  states:

> 3  Well before her crime when she was suicidal and depressed and sent by BHR to
> [Western State Hospital ("WSH")], they put her on a combination of paroxetine
> 4  and VPA [Valproic acid]. When on that combination she didn't have thoughts of
> wanting to kill others, but when she got out she stopped the VPA . . . . Without the
> 5  VPA she had cravings to drink on paroxetine alone, and did drink heavily. So it is
> hard to know if without alcohol the paroxetine would have the same effect.

6  *Id.*

7  Dr. Hall entered another progress note on June 18, 2018. *Id.* at 208. Dr. Hall states that

8  Petitioner "asked to resume paroxetine, despite acknowledging that it made her want to kill

9  people." *Id.* Dr. Hall further states that "[we] shared our concerns that [Petitioner] has an

10  underlying bipolar diathesis and that paroxetine had possibly triggered an irritable manic state,

11  leading to her crime." *Id.* Dr. Hall added that Petitioner "did not appear to appreciate" the "risks"

12  of Paxil. *Id.* Dr. Hall did not prescribe Paxil. *See id.* at pp. 206, 209.

13              iii.    <u>Analysis</u>

14  Even assuming Petitioner's sentencing counsel, Mr. O'Connor, performed deficiently by

15  failing to hire a different expert to present mitigation evidence (a question this Court needs not

16  and does not reach), there is no "reasonable probability that, but for [O'Connor's alleged]

17  unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

18  U.S. at 694. "In assessing prejudice, we reweigh the evidence in aggravation against the totality

19  of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). "The likelihood

20  of a different result must be substantial, not just conceivable." *Apelt v. Ryan*, 878 F.3d 800, 832

21  (9th Cir. 2017) (quoting *Richter*, 562 U.S. at 112).

22  Reweighing all the evidence, Petitioner has not shown the likelihood of a different result

23  is substantial based on the new evidence submitted with the amended PRP. As stated above,

24

1  during sentencing, the trial court considered the impacts of Paxil on Petitioner. The trial court

2  also considered multiple other factors, including Petitioner's alcohol use, mental health issues,

3  difficult upbringing and the gruesomeness of the crime. The trial court noted that Mr. Alkins'

4  death involved actions over a period of hours, involved numerous assaultive acts, and slitting his

5  throat in a manner that would have resulted in death through loss of blood. The trial court noted

6  that Petitioner was afraid Mr. Alkins would try to leave and it could be inferred Mr. Alkins

7  attempted to leave. Moreover, based on the evidence, the trial court found Mr. Alkins attempted

8  to resist the strangulation because his fingers were inside the cord that was wrapped around his

9  neck.

10      The evidence also shows Petitioner had a history of anger management issues and violent

11  conduct, including assaulting a sexual partner and holding a knife to her mother's throat. *See*

12  Dkt. 15-2, p. 135. The record, including the new evidence, does not indicate Petitioner was on

13  Paxil when she engaged in the previous violent behavior. Further, approximately one month

14  before the murder, Petitioner reported she had been on Paxil in the past and it had "worked

15  well." *Id*. And, on April 25, 2013, four days before the murder, Petitioner reported that she did

16  not like that Paxil made her feel "calmer and happier" and reported the medication seemed to

17  "take away her energy for acting out in anger." *Id*. at p. 171. At the time of the murder, Petitioner

18  had ingested a "crazy amount" of vodka. *Id*. at pp. 182-84. And, Petitioner admitted to hiding the

19  knife/boxcutter in Mr. Alkins' bedroom prior to the murder with intentions to harm Mr. Alkins.

20  *Id*. at p. 188; *see also* Dkt. 15-3, pp. 672-73.

21      Moreover, the record before the trial court contained Dr. Dixon's opinion, wherein he

22  opined that Paxil use and withdrawal exacerbated Petitioner's mood disorder into a manic state

23  and that Paxil and vodka contributed to a decreased ability to inhibit impulses. Dr. Young opined

24

1  that Petitioner was not experiencing Paxil withdrawals and that it was possible Paxil generated

2  aversive side effects, but more likely the psychotic symptoms stemmed from alcohol abuse.

3         The new evidence shows Dr. Saint Martin opined that Drs. Dixon and Young did not

4  have experience in the behavioral effects of psychiatric medications and that Petitioner needed a

5  psychiatric evaluation. Dkt. 15-2, pp. 58-60. Dr. Saint Martin found that, based on Petitioner's

6  treatment following the murder, doctors concluded Paxil was linked to Petitioner's violent

7  impulses. *Id*. Dr. Saint Martin's conclusion is that Paxil was responsible for Petitioner's

8  aggressive and violent behavior resulting in Mr. Alkins' death.

9         The Court finds Petitioner has not shown there is a reasonable probability that the result

10  would have been different had Petitioner's counsel provided Dr. Saint Martin's opinions to the

11  trial court. Dr. Saint Martin's opinions are conclusory and speculative. For example, his opinions

12  appear to be based on studies that indicate Paxil can produce adverse effects of agitation, anger

13  and acting on violent impulses. Dr. Saint Martin relies on Petitioner's diagnosis of bipolar

14  disorder as one reason Petitioner would have adverse effects on Paxil; however, the record shows

15  conflicting evidence regarding whether Petitioner has bipolar disorder. *See* Dkt. 15-2, p. 775

16  (finding bipolar disorder not supported). Additionally, Dr. Saint Martin, unlike Drs. Dixon and

17  Young, did not meet with Petitioner, but only did a records review. His report also not reference

18  the fact Petitioner had reported doing well on Paxil in the past and, that days before the murder,

19  Petitioner reported she was feeling calmer and happier on Paxil. Moreover, if counsel had

20  presented the opinion of Dr. Saint Martin or a similar expert at the time of sentencing it could

21  have opened the door for the prosecution to retain an additional expert.

22         Petitioner also submitted 2018 treatment notes that recognized Petitioner appeared to

23  drink heavily when taking Paxil without valproic acid and that it was hard to know if Petitioner

24

1 would have thoughts of wanting to kill others if she was taking Paxil without alcohol. *See* Dkt.

2 15-2, pp. 206, 208-09. The Court notes the newly submitted 2018 treatment records would not

3 have been available to Petitioner's sentencing counsel or the trial court. Regardless, these

4 treatment records indicate the voluntary ingestion of alcohol combined with Petitioner's

5 medications, not the Paxil alone, resulted in thoughts of wanting to kill others. Thus, there is not

6 a reasonable probability the 2018 treatment records would have changed the result of Petitioner's

7 sentencing.

8        Reweighing all the evidence, Petitioner has not shown there is a reasonable probability

9 that the result would have been different had Petitioner's sentencing counsel submitted the new

10 evidence attached to the amended PRP to the trial court. At most, the new evidence provides

11 speculation that the trial court may have considered the impacts of Paxil on Petitioner more

12 favorably; however this is not sufficient to show prejudice. *See Murphy v. Ohio*, 551 F.3d 485,

13 496 (6th Cir. 2009) (internal quotations omitted) ("there is an insufficient showing of prejudice

14 where one is left with pure speculation on whether the outcome of the trial or the penalty phase

15 could have been any different"). Considering the facts surrounding the murder and the mitigation

16 evidence presented to and considered by the trial court, Petitioner has not shown her trial-level

17 ineffective assistance of counsel claim is meritorious. Therefore, Petitioner has not met the first

18 prong under the *Martinez* analysis and has failed to establish "cause" to overcome the procedural

19 default. Accordingly, Ground 1 is procedurally barred.[2]

20

21

22

23

24      [2] As the Court finds Petitioner has not shown the underlying ineffective assistance of counsel claim has merit, the Court declines to consider the remaining three prongs of the *Martinez* analysis.

**B.  Ground 2**

Petitioner alleges that her "[m]ultiple convictions for assault and murder violated double jeopardy." Dkt. 1 at 7. She reasons that "[t]he murder conviction and assault convictions all stemmed from a single criminal episode with one intention of killing the same person, Mr. Alkins." *Id.* Therefore, Petitioner contends that she "should not have received separate and increased sentences for the three assault counts and the one murder count." *Id.* Alternatively, Petitioner contends that she "should have been sentenced only for one assault count and not three." *Id.*

Petitioner last raised this claim in her PRP. Dkt. 15-1 at 239–47. However, the state court of appeals declined to consider this claim because Petitioner "raised the same issue in her direct appeal." *Matter of Tricomo*, 13 Wash. App. 2d 223, 234 (2020) ["*Tricomo II*"]. So, to determine its reasoning for denying this claim, the Court looks to the state court of appeals' decision on direct appeal. *Cf. Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Regarding Petitioner's contention that she should not have received separate and increased sentences for the three assault counts and the one murder count, the state court of appeals asked "whether the convictions were the same in law and in fact." *State v. Tricomo*, 193 Wash. App. 1037, at *4 (2016) ["*Tricomo I*"] (citation omitted). "If there is an element in each offense which is not included in the other, and proof of one offense would not necessarily also prove the other, the offenses are not constitutionally the same and the double jeopardy clause does not prevent convictions for both offenses." *Id.* (citation omitted). The state court of appeals found that Petitioner's "convictions for second degree murder and second degree assault [were] legally different." *Id.* It reasoned: "Proof of second degree assault does not necessarily prove second degree murder because a person can assault another person without actually causing

1    death. Second degree murder, on the other hand, requires proof of intent to cause death, and

2    actual death." *Id.*[3]

3          As relevant here, the Double Jeopardy Clause "protects against multiple punishments for

4    the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). "With respect to

5    cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than

6    prevent the sentencing court from prescribing greater punishment than the legislature intended."

7    *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). Where, as here, there is no "clear indication of []

8    legislative intent" to impose "cumulative punishment," courts apply the test in *Blockburger v.*

9    *United States*, 284 U.S. 299 (1932). *See Hunter*, 459 U.S. at 366–67. Under *Blockburger*, "where

10   the same act or transaction constitutes a violation of two distinct statutory provisions, the test to

11   be applied to determine whether there are two offenses or only one, is whether each provision

12   requires proof of [an element] which the other does not." *See* 284 U.S. at 304.

13         Here, the state court of appeals determined that second-degree murder and second-degree

14   assault each "require[d] proof of a different element" that the other did not. *See id.* at 304; *see*

15   *also Tricomo I*, 193 Wash. App. 1037, at *4 (citation omitted). The state court of appeals'

16   determination of the elements of second-degree murder and second-degree assaults bind this

17   Court. *See Brown v. Ohio*, 432 U.S. 161, 167 (1977) ("[T]he Ohio Court of Appeals has

18   authoritatively defined the elements of the two Ohio crimes[.]"); *see also Bradshaw v. Richey*,

19   546 U.S. 74, 76 (2005). Therefore, the state court of appeals reasonably rejected Petitioner's

20   contention that she should not have received separate and increased sentences for the three

21   assault counts and the one murder count.

22

23   _____

24        [3] Petitioner has not argued that Division Two incorrectly concluded second-degree murder and second-
     degree assault each has an element not included in the other. *See* Dkt. 22 at 27–28.

1    Petitioner contends that the state court of appeals' decision is inconsistent with the

2    Supreme Court's decision in *Brown*. Dkt. 22 at 27–29. But *Brown* is distinguishable; the offenses

3    there were the "same" under *Blockburger* because one offense "require[d] no proof beyond that

4    which [was] required for [the other]." 432 U.S. at 168. As noted, Petitioner does not argue that

5    second-degree murder and second-degree assault are the same under *Blockburger* and instead

6    discusses other aspects of *Brown*'s reasoning. *See* Dkt. 22 at 27–28. But *Brown*'s determination

7    that the two offenses were the same under *Blockburger* was essential to its holding. *See, e.g.*, 432

8    U.S. at 169 ("The applicable Ohio statutes, as written and as construed in this case, make the

9    theft and operation of a single car a single offense."). Because Petitioner has not discussed this

10   key aspect of *Brown*'s holding, Petitioner has not met her burden under § 2244(d) to show that

11   the state court of appeals' decision was unreasonable. *See Cullen v. Pinholster*, 563 U.S. 170,

12   181 (2011) (petitioners have the burden of proof under § 2254(d) (citation omitted)).

13   Alternatively, Petitioner contends that she "should have been sentenced only for one

14   assault count and not three." Dkt. 1 at 7.

15   Petitioner "was charged, in relevant part, with three counts of second degree assault

16   stemming from the events of one evening." *Tricomo I*, 193 Wash. App. 1037, at *2. "Count II

17   charged second degree assault based on the use of a razor knife to inflict neck wounds." *Id.*

18   (internal quotation marks omitted). "Count III charged second degree assault based on the use of

19   a razor knife to inflict facial wounds." *Id.* (internal quotation marks omitted). "And count IV

20   charged second degree assault based on the use of a razor knife to inflict hand wounds." *Id.*

21   (internal quotation marks omitted). The State charged Petitioner with second-degree assault

22   based on use of a razor knife to inflict neck wounds under R.C.W. § 9A.36.021(1)(a). The State

23   charged the remaining assault offenses under R.C.W. § 9A.36.021(1)(c). Dkt. 15-3 at 560–61.

24

Petitioner "pleaded guilty as charged and agreed that the trial court could rely on the State's statement of probable cause and police reports to find the facts necessary to establish a factual basis for her plea." *Tricomo II*, 193 Wash. App. 1037, at *3.

The state court of appeals held that Petitioner's convictions on count II (assault based on neck wounds) and count IV (assault based on hand wounds) did not violate double jeopardy because "the assault that resulted in neck wounds was a separate course of conduct from the assault that resulted in wrist wounds." *Id.* It reasoned:

> [I]f multiple assaultive acts constitute only one course of conduct, then double jeopardy protects against multiple convictions. There is no bright-line rule for when multiple assaultive acts constitute one course of conduct. In determining whether multiple assault acts constitute one course of conduct, we consider the length of time over which the acts occurred, the location of the acts, the defendant's intent or motivation for the assaultive acts, whether the acts were uninterrupted, and whether there was an opportunity for the defendant to reconsider her acts. No single factor is dispositive, and the ultimate determination should depend on the totality of the circumstances, not a mechanical balancing of the various factors.
>
> Here, the assaultive acts occurred over several hours and in different places in the victim's home. According to [Petitioner], there were hours in between the act of slitting the victim's throat and cutting the victim's wrists. Further, [Petitioner's] account of the events indicate that her motivation for the two attacks was different. [Petitioner] stated that she brought the knife with her into the upstairs bedroom as preparation to kill the victim, but that she cut the victim's wrists because the victim was attempting to take the knife from her. And, she had considerable time to reconsider her actions. For instance, she had time to reconsider during the hours the victim spent walking around the house after she slit his throat in the upstairs bedroom and before she cut his wrists during the struggle at the entryway.

*Id.* (citations and internal quotation marks omitted).

Where, as here, a defendant alleges that she has engaged in "a single act or transaction" or one course of conduct but has been convicted of "multiple violations of the same statutory provision," courts ask what the legislature "'has made the allowable unit of prosecution.'" *See United States v. Keen*, 104 F.3d 1111, 1118 (9th Cir. 1996) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221 (1952)).

1        In Washington, "[t]here is no bright-line rule for when multiple assaultive acts constitute

2    one course of conduct." *State v. Villanueva-Gonzalez*, 180 Wash. 2d 975, 985 (2014) (en banc).

3    Courts generally consider: (1) the "length of time over which the assaultive acts took place"; (2)

4    whether "the assaultive acts took place in the same location"; (3) the "defendant's intent or

5    motivation for the different assaultive acts"; (4) whether "the acts were uninterrupted or whether

6    there were any intervening acts or events"; and (5) whether "there was an opportunity for the

7    defendant to reconsider his or her actions." *Id.*

8        Here, applying at least four of these factors to Petitioner's conduct, the state court of

9    appeals concluded that "the assault that resulted in neck wounds was a separate course of

10    conduct from the assault that resulted in wrist wounds." *Tricomo I*, 193 Wash. App. 1037, at *3.

11    The record supports its factual findings regarding Petitioner's conduct. *See* Dkt. 15-3 at 556–57

12    (probable cause affidavit). Based on these undisputed facts, the state court of appeals reasonably

13    applied *Villanueva-Gonzalez*'s "controlling [judicial] gloss" for whether multiple assaultive acts

14    constitute one course of conduct. *Cf. Bell v. United States*, 349 U.S. 81, 83 (1955).

15        Petitioner contends that this ruling was contrary to *Brown*. Dkt. 22 at 27–29. However,

16    *Brown* is inapposite. *Brown* involved two different statues that were the same under the

17    *Blockburger* test. 432 U.S. at 168. By contrast, "[R.C.W. 9A.36.021] defines a single crime—

18    second-degree assault—and provides [] different means by which a person can commit that

19    crime." *United States v. Robinson*, 869 F.3d 933, 941 (9th Cir. 2017) (internal quotation marks

20    omitted). "Because only a . . . single statute is at issue here, [courts] do not analyze this [claim]

21    under [*Blockburger*'s] 'same evidence' test." *See Sanabria v. United States*, 437 U.S. 54, 70 n.24

22    (1978) (collecting cases). Petitioner has not identified any other Supreme Court holdings that the

23    state court of appeals' decision was contrary to, or an unreasonable application of, and the

24

Court's research did not reveal any. *See Pinholster*, 563 U.S. at 181 (petitioners have the burden of proof under § 2254(d)).

In rejecting Petitioner's argument that her assault conviction for inflicting facial wounds violated double jeopardy, the state court of appeals provided a different rationale. The state court of appeals held that Petitioner waived this double jeopardy challenge because she pleaded guilty and the alleged double jeopardy violation was not clear from the record on appeal. *See Tricomo I*, 193 Wash. App. 1037, at *3 (citing *State v. Knight*, 162 Wash. 2d 806, 811 (2008)). *Knight* cited *United States v. Broce*, 488 U.S. 563 (1989), for the proposition that "[a]fter a guilty plea the double jeopardy violation must be clear from the record presented on appeal, or else be waived." 162 Wash. 2d at 811 (citing 488 U.S. at 575–76).

"A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." *Broce*, 488 U.S. at 569. "Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary." *Id.* "If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack." *Id.*

In *Broce*, the defendants "pleaded guilty to two charges of conspiracy on the explicit premise of two agreements which started at different times and embraced separate objectives." *Id.* at 571. Thus, *Broce* found that they "conceded that [they had] committed two separate crimes." *See id.* at 570. Consequently, their "double jeopardy challenge [was] foreclosed by [their] guilty pleas and [their] judgments of conviction." *Id.* at 565.

*Broce* stated that "[t]here are exceptions where on the face of the record the court had no power to enter the conviction or impose the sentence." *Id.* at 569. It acknowledged one such

1    exception in *Menna v. New York*, 423 U.S. 61 (1975). *Broce*, 488 U.S. at 575. *Menna* held that

2    "a plea of guilty to a charge does not waive a [double jeopardy] claim that judged on its face [] is

3    one which the State may not constitutionally prosecute." 423 U.S. at 62 n.2. However, *Broce*

4    distinguished *Menna* because, in *Menna*, "the indictment was facially duplicative of the earlier

5    offense of which the defendant had been convicted and sentenced so that the admissions made by

6    [the defendant's] guilty plea could not conceivably be construed to extend beyond a redundant

7    confession to the earlier offense." *Broce*, 488 U.S. at 575–76. By contrast, in *Broce*, the

8    defendants "pleaded guilty to indictments that on their face described separate conspiracies." *Id.*

9    at 576. Therefore, the defendants in *Broce* could not "prove their claim by relying on those

10   indictments and the existing record." *Id.* So the above exception to waiver did not apply. *See id.*

11        Here, the state court of appeals reasonably applied *Broce*. Trial counsel represented

12   Petitioner when she pleaded guilty and, as discussed below, her guilty plea was voluntary. *See*

13   *infra* pp. 35–37. Furthermore, the amended information alleged that Count III involved the use of

14   a razor knife to inflict facial wounds and that Petitioner committed this assault "separate and

15   apart" from the other assault charges. Dkt. 15-3 at 560. Because Petitioner pleaded guilty to the

16   amended information, *id.* at 604–05, her claim is "foreclosed by the admissions inherent in [her]

17   guilty plea[.]" *See Broce*, 488 U.S. at 576. True, the state court of appeals found that the

18   probable cause affidavit did not "include any information about count III." *Tricomo I*, 193 Wash.

19   App. 1037, at *3. However, the state court of appeals did not reference the indictment's

20   allegation that the assaults were committed "separate and apart" each other. Dkt. 15-3 at 560–61.

21        Furthermore, the state court of appeals' rejection of this claim would be reasonable even

22   if the indictment did not contain the "separate and apart" allegation. In that event, because she

23   voluntarily pleaded guilty, Petitioner would still have to show that the trial court had "no power"

24

1    "on the face of the record . . . to enter the conviction or impose the sentence." *See Broce*, 488

2    U.S. at 569, 575. She has not made this showing. She merely states that the probable cause

3    affidavit "did not contain any facts regarding the facial wounds." Dkt. 22 at 28. But this was the

4    state court of appeals' point: there were no facts about Petitioner's infliction of facial wounds.

5    Thus, there were no facts from which the trial court could have concluded that count III was "one

6    course of conduct" with one or both of the other assaults. *See Villanueva-Gonzalez*, 180 Wash.

7    2d at 985. Petitioner could have provided these facts during her plea colloquy but did not. *See*

8    Dkt. 15-3 at 611; *cf. Broce*, 488 U.S. at 574 ("A failure by counsel to provide advice may form

9    the basis of a claim of ineffective assistance of counsel, but absent such a claim it cannot serve as

10   the predicate for setting aside a valid plea."). This case is not comparable to *Menna*, where "the

11   indictment was facially duplicative of the earlier offense of which the defendant had been

12   convicted and sentenced." *See Broce*, 488 U.S. at 575–76.

13       Therefore, Petitioner has not shown that the state court of appeals' rejection of Ground 2

14   was contrary to, or an unreasonable application of, clearly established federal law or an

15   unreasonable determination of the facts. Accordingly, the Court recommends Ground 2 be

16   denied.

17   **C. Ground 3**

18       In Ground 3, Petitioner contends that her guilty plea was not knowing and voluntary in

19   violation of due process. Dkt. 1 at 8. In support, she alleges that she "was [incorrectly] told that

20   the maximum sentence for the murder count was life in prison and 10 years for the assault

21   counts." *Id.* She contends that, under *Blakely v. Washington*, 542 U.S. 296 (2004), "the

22   maximum sentences were the top ends of the standard ranges (357 and 70 months). *Id.* She adds:

23

24

1    "I was misadvised of the maximum sentences and the guilty plea was not knowing and

2    voluntary, and I should have been allowed to withdraw the guilty plea." *Id.*

3         On direct appeal, the state court of appeals rejected this claim. *Tricomo I*, 193 Wash.

4    App. 1037, at *1. It reasoned:

5         [Petitioner] pleaded guilty to second degree murder. At the plea hearing, the trial
          court informed her that the applicable maximum term of confinement was a life
6         sentence and the standard range of actual confinement was 257 to 357 months, with
          the State recommending a sentence of 357 months. [Petitioner] acknowledged that
7         she understood. The court then sentenced [Petitioner] within the standard range.

8         [Petitioner] contends that her plea was not made knowingly, voluntarily, and
          intelligently because the trial court misinformed her of the applicable maximum
9         sentence for the offense with which she was charged. [Petitioner] asserts that the
          applicable maximum sentence was the top end of the standard range, not the
10        statutory maximum sentence declared by the legislature. Citing [*Blakely*],
          [Petitioner] claims that the trial court misinformed her when it told her that life
11        imprisonment was the applicable maximum sentence for second degree murder.

12        [The Washington Court of Appeals rejected this argument in *State v. Kennar*, 135
          Wash. App. 68 (2006)]. In [*Kennar*], the court held that CrR 4.2 requires the trial
13        court to inform a defendant of both the applicable standard sentence range and the
          maximum sentence for the charged offense as determined by the legislature . . . .
14        [N]oting that *Blakely* is a sentencing case, not a plea-entry case," [*Kennar*
          distinguished *Blakely*, reasoning that],
15
              [b]ecause a defendant's offender score and standard sentence range
16            are not finally determined by the court until the time of sentencing,
              the Sixth Amendment concerns addressed in *Blakely* do not apply
17            until that time. Thus, when Kennar entered his guilty plea, the
              maximum peril he faced was, in fact, life in prison. He was correctly
18            informed of this by the trial court . . . .

19        Similarly here, at the time of her plea, [Petitioner] was informed of the maximum
          sentence and the standard sentence range for the charged offense. . . .
20
     *Tricomo I*, 193 Wash. App. 1037, at *5.

21
          "[I]f a defendant's guilty plea is not equally voluntary and knowing, it has been obtained
22
     in violation of due process and is therefore void." *McCarthy v. United States*, 394 U.S. 459, 466

23
     (1969). "The standard was and remains whether the plea represents a voluntary and intelligent

24

REPORT AND RECOMMENDATION - 30

1    choice among the alternative courses of action open to the defendant." *Parke v. Raley*, 506 U.S.

2    20, 29 (1992) (citation omitted). This happens when the defendant has "a full understanding of

3    what the plea connotes and of its consequence[s]" and chooses to plead guilty without being

4    coerced to do so. *See Boykin v. Alabama*, 395 U.S. 238, 242–44 (1969); *see also Brady v. United*

5    *States*, 397 U.S. 742, 755 (1970) (citation omitted). "The voluntariness of [the defendant's] plea

6    can be determined only by considering all of the relevant circumstances surrounding it." *Brady*,

7    397 at 749 (citations omitted).

8         "In assessing the voluntariness of the plea, statements made by a criminal defendant

9    contemporaneously with his plea should be accorded great weight." *Chizen v. Hunter*, 809 F.2d

10   560, 562 (9th Cir. 1986) (citing *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977)). "[T]he

11   representations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any

12   findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent

13   collateral proceedings." *Blackledge*, 431 U.S. at 73–74. "Solemn declarations in open court carry

14   a strong presumption of verity." *Id.* at 74.

15        Here, the state court of appeals reasonably rejected this claim. During her plea colloquy,

16   Petitioner stated that: (1) she had a college degree; (2) trial counsel had reviewed the plea

17   agreement with her and answered all her questions about the case; (3) she knew she was waiving

18   constitutional rights by pleading guilty; and (4) no one had promised her anything to get her to

19   plead guilty or forced her to plead guilty. Dkt. 15-3 at 605–06, 610.

20        Furthermore, the trial court informed her that, on count I (second-degree murder), her

21   "standard range of actual confinement . . . would be 257 to 357 months, . . . and a maximum term

22   of confinement of life." *Id.* at 607. Further, the trial court informed her that the prosecutor was

23   "going to recommend" "at the time of sentencing" "357 months on Count 1." *Id.* at 608. Yet

24

1  Petitioner acknowledged that she was "not agreeing that that [was] what the court should order

2  and that . . . Mr. O'Connor [would] be able to argue . . . [for] a lesser sentence." *Id.*

3      *Kennar* held that "CrR 4.2 requires the trial court to inform a defendant [at the time the

4  plea is made] of both the applicable standard sentence range and the maximum sentence for the

5  charged offense as determined by the legislature." *See* 135 Wash. App. at 72–75. The Court

6  cannot reconsider this state-law determination on habeas review. *See, e.g.*, *Richey*, 546 U.S. at

7  76. As in *Kennar*, the trial court informed Petitioner of applicable standard sentencing range (257

8  to 357 months) and the statutory maximum on count I (life imprisonment). So the state court of

9  appeals reasonably concluded that the trial court did not misadvise Petitioner.

10     Petitioner contends that the state court of appeals' decision is contrary to *Blakely*. Dkt. 22

11  at 30. However, *Blakely* involved a Sixth Amendment challenge to a state court's imposition of a

12  90-month sentence after judicial factfinding even though the "facts admitted in [the guilty] plea,

13  standing alone, supported a maximum sentence of [only] 53 months." *See* 533 at 298, 303. Here,

14  however, the trial court did not engage any judicial factfinding resulting in the imposition of a

15  sentence greater than the "[357]-month statutory maximum of the standard range." *See id.* at 303.

16  *Blakely* is inapplicable. And the remaining cases Petitioner cites simply state general principles

17  governing due process challenges to the voluntariness of guilty pleas and are readily

18  distinguishable factually. *See* Dkt. 22 at 29–30.

19     In sum, Petitioner has not shown that the state court of appeals' rejection of Ground 3

20  was contrary to, or an unreasonable application of, clearly established federal law or an

21  unreasonable determination of the facts. Accordingly, the Court recommends Ground 3 be

22  denied.

23

24

1    **IV.    EVIDENTIARY HEARING**

2         The decision to grant an evidentiary hearing lies within the discretion of the Court.

3    *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The Court "must consider whether such a

4    hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

5    entitle the applicant to federal habeas relief." *Id.* at 474 (citation omitted). "It follows that if the

6    record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

7    court is not required to hold an evidentiary hearing." *Id.*

8         Here, based on the facts in the state court record, Petitioner has not shown that the state

9    court of appeals unreasonably rejected the grounds raised in the Petition. Because the record

10   precludes relief, an evidentiary hearing is improper.

11   **V.    CERTIFICATE OF APPEALABILITY**

12        The Court also recommends that no certificate of appealability be issued. A petitioner

13   seeking post-conviction relief under § 2254 may appeal a district court's dismissal of the federal

14   habeas petition only after obtaining a certificate of appealability from a district or circuit judge.

15   A certificate of appealability may issue only if a petitioner has made "a substantial showing of

16   the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). When a district court rejects a

17   constitutional claim on the merits, to obtain a certificate of appealability, the petitioner "must

18   demonstrate that reasonable jurists would find the district court's assessment of the constitutional

19   claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 474 (2000). Here, because

20   Petitioner has not so shown, a certificate of appealability should be denied.

21   **VI.    CONCLUSION**

22        As discussed above, it is **recommended** that the Petition (Dkt. 1) be **denied,** that no

23   evidentiary hearing be held, and a certificate of appealability be **denied**.

24

1    Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

2  fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P.

3  6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

4  review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

5  objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

6  *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

7  imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on

8  November 18, 2022, as noted in the caption.

9    Dated this 31st day of October, 2022.

10

11    David W. Christel
12    United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24